JOHN J. O'SHEA, APPELLANT, V. EDWARD O'SHEA ET AL.,
APPELLEES.

11 N. W. (2d) 540

FILED OCTOBER 29, 1943.   No. 31588.

*F. M. Deutsch, Marion B. Foster, Fay H. Pollock* and *Cline, Williams & Wright,* for appellant.

*Moyer & Moyer* and *R. J. Shurtleff, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, YEAGER and CHAPPELL, JJ., and LIGHTNER, District Judge.

SIMMONS, C. J.

The plaintiff seeks here by petition in equity to quiet title in him to some 400 acres of land in Madison county, Nebraska. The defendant prayed that the title be quieted in him. The defendant by cross-petition sought a money judgment upon a promissory note. The trial court quieted title to the land in the defendant and awarded the defendant a judgment against the plaintiff on the note. Plaintiff appeals. We reverse the judgment of the district court and remand the cause with directions to quiet title to the land in the plaintiff, direct an accounting for rents and profits; set aside the money judgment; and direct that the motion to strike the cross-petition be sustained.

As a preliminary fact statement it may be said that the plaintiff John J. O'Shea and the defendant Edward O'Shea are brothers and Ella O'Shea mentioned herein was their sister. They are generally referred to in the record by their first names and for clarity that plan will be followed in this opinion. The transcript of the pleadings consists of 150 pages. The summary of the pleadings is here made in order that the general situation may be presented and is not a complete and full analysis of all allegations made.

Plaintiff, by petition (later amended) filed July 5, 1940, alleged that he was the owner of some 400 acres of land in Madison county, Nebraska, which he conveyed to his sister Ella O'Shea in 1904 under an oral understanding that she was to hold title to the same; that she was to have the use and benefit of it during her lifetime, subject to the understanding that if he, the plaintiff, or plaintiff's wife, became in need they were to have support from the land and that if he, the plaintiff, survived his sister Ella, Ella was to devise the land to the plaintiff, but that if Ella survived the plaintiff she was to become the owner of the land; that thereafter in 1913 Ella made a will devising said land to the plaintiff; that Ella died in 1938, that her will was admitted to probate, that the probate of her estate had been completed with all claims paid; that plaintiff was the owner of the land; that the defendant Edward O'Shea claimed ownership by virtue of a deed from Ella to him in 1935. Plaintiff prayed that the title to said premises be quieted in him and for an accounting for rents and profits. Defendant, Edward O'Shea, by answer and cross-petition, alleged that Ella became the owner of the land by virtue of the 1904 deed; alleged his ownership of the land by virtue of the 1935 deed; that when he received the conveyance he had no knowledge of the alleged verbal agreement between the plaintiff and Ella O'Shea; that Ella at all times exercised all rights as owner of the premises and that plaintiff is estopped to deny her title; that the alleged oral agreement was void by virtue of the statute of frauds; that subsequent to the probate of Ella's will he had, on demand of the plain-

tiff, conveyed other lands, claimed by him, to plaintiff, that said conveyances constituted a settlement and that plaintiff was estopped to claim the land in question.

Defendant further, by cross-petition, alleged the execution and delivery to him by plaintiff of a promissory note for $18,641.64 representing money loaned to plaintiff at different times by Edward and Ella; that he had on June 14, 1940, filed his petition to recover judgment at law on the note, without knowledge of plaintiff's claim as set out in his petition; that John had answered in that action alleging that the debt to Ella was to have been surrendered on her death. Defendant alleged that the title to said notes and to the real estate should be quieted in him. Defendant prayed that the court in equity take jurisdiction of all issues pleaded; that the title to the real estate and note be quieted in him; and for an accounting and judgment on the note.

The matter came on for hearing, on motion to strike the allegations of the cross-petition with reference to the note, before the late judge of the district court, Charles H. Stewart, and he ordered that part of the cross-petition stricken.

Plaintiff then by reply alleged that the defendant knew the terms and conditions under which the conveyance was made to and title held by Ella O'Shea; that defendant was not a *bona fide* purchaser for value without notice.

Defendant then filed a motion to consolidate his action on the note with plaintiff's action. This motion was denied.

The matter then went to trial before Judge Stewart in March, 1941, and was taken under advisement by him. Before a decision was announced Judge Stewart died. The matter was then presented to Judge Wenke, then a district judge of that district, on a renewed motion to consolidate, which Judge Wenke denied. After more preliminary motions the matter went to trial before Judge Wenke in June, 1942, resulting in his sustaining a motion for a mistrial and ordering a retrial. Thereafter the defendant filed his motion for leave to file an amended and supplemental answer and cross-petition and a motion to consolidate the two

actions. These motions then came on for hearing before Judge Jackson, a judge of that district, and were by him granted. The plaintiff then demanded a jury trial on the issues presented by the action upon the note and that demand was then and subsequently denied.

In the meantime a transcript of the evidence produced before Julge Stewart, consisting of over 1,000 pages, had been made and it was stipulated that that transcript should be considered at the new trial together with whatever additional evidence might be offered by the parties and received by the court.

Plaintiff moved to vacate the order of consolidation, to vacate the order permitting the filing of the amended answer and cross-petition, and to vacate the order denying a jury trial on the note. These motions were again denied. Plaintiff then replied to the amended answer and cross-petition, setting out an extended statement of alleged facts both with reference to the deed and the note. To the answer as to the notes defendant filed a reply.

The matter then went to trial and in addition to the transcript of the evidence of the former trial some 500 more pages of testimony were taken before Judge Jackson. This was devoted largely to evidence of experts, in part by deposition, as to whether or not the description of the land involved was written into the 1935 deed when prepared, or at a subsequent time, to a reoffer of evidence in various depositions, and to evidence offered by the defendant as to the note. Plaintiff refused to offer evidence as to the note and preserved his objections to the consolidation, to the cross-petition and his demand for a jury trial. After the trial was completed, and before decision had been made, defendant dismissed without prejudice his separate action on the note, and thereby removed the question of the correctness of the consolidation of the two cases. However his cross-petition on the note remained in the action before the trial court.

Finally in October, 1942, the trial court entered extended findings and quieted title to the land in the defendant and

entered judgment for the defendant against the plaintiff on the note with interest in the sum of $22,557.13.

After motion for new trial was overruled plaintiff appeals here presenting some 106 assignments of error largely directed to rulings on the admissibility of evidence. Plaintiff presents generally three questions: (1) Whether or not the title should have been quieted in the plaintiff? (2) Whether or not the cross-petition on the note should have been allowed in the equity suit? (3) Whether or not the plaintiff should have been denied a jury trial on the issues pleaded as to the note? These questions will be determined so far as necessary separately.

As to the first question plaintiff presents four propositions: (1) That Ella O'Shea held title to the land by a constructive trust for the plaintiff. (2) That the deed of 1935 was secured by fraud and undue influence. (3) That the 1935 deed was not legally delivered. (4) That the deed was a forgery, in that he claimed the description to the land in question was inserted in the deed, after the remaining description was written and after its execution by Ella O'Shea. An issue tendered by the pleadings, that Ella O'Shea was mentally incompetent to make the 1935 deed, was removed from the case by stipulation of counsel during trial.

The interveners in this action allege that by deed from John J. O'Shea dated in October, 1941, they hold title to 80 acres of this land and sums due from rents and profits and join with plaintiff in the prayer of his amended petition. They also filed a motion for a new trial and are appellants here.

Patrick O'Shea, his wife and six children, John, Ella, Edward, Thomas, Peter and Frank, came to Madison county in 1874. Ella, Edward and Frank never married. In 1886 Thomas entered the real estate business and later engaged in banking at Madison. Prior to 1886 John and Peter had Thomas entered the real estate business and later engaged to Nebraska, John going into the real estate business at Newman Grove and Peter into business at Humphrey. John prospered and in 1891 had holdings which he valued at

$20,000. Frank had been in Colorado with the others and remained there. In 1891 he had holdings valued at $1,000. At the suggestion of the father, John persuaded Frank to return to Nebraska. Frank and John in 1891 entered into the real estate business at Newman Grove as O'Shea Brothers, each contributing their then holdings and on a "fifty-fifty" basis, John and Frank lived together in a home at Newman Grove. About that time John contributed some $1,600 to the purchase of land for his father. About that time also the father and mother, together with Ella and Edward, moved the home to the city of Madison. The mother died in 1896. The father spent the following winter in Texas and upon his return to Madison in 1897 was, for some reason not disclosed by the record, denied admission to the home by Edward and went to live with John and Frank at Newman Grove, where he remained until his death in 1916. The record discloses a coldness between the father and Edward thereafter, continuing so long as the father lived, although it appears that Edward, at one time during the absence of John, looked after his father's land. The father, in his will made in 1912, made no distinction between his children and named John and Edward as executors. Edward and Ella continued to live in the same home in Madison until Ella's death.

The business of John and Frank prospered. Frank died May 13, 1904. At that time the partnership holdings were estimated to be worth $75,000.

It appears that John early established the practice of placing the title to land owned by him in, or having land which he purchased conveyed to, third parties for him. Some of this land was at different times in the names of parties not related to him, and at other times in the name of Ella. At the time of Frank's death Ella held title to a considerable acreage of land belonging to the partnership of Frank and John. At the time of her death she held title to land belonging to John, and which was conveyed to John by Edward (reference to which will be made later). Other partnership land was in Frank's name at the time of his

death. The partnership's bank account was in Frank's name. John's reason for starting this practice was that land held ostensibly by a third party could be more advantageously sold and occasional commissions collected from a buyer. , Also John at one time had a judgment against him, although after the judgment was paid the practice continued. It does not appear that there was ever any memoranda, agreements or writing evidencing the ownership of these lands made by any of the parties.

After Frank's death intestate May 13, 1904, John and Edward held at least one, if not more conferences, to determine what should be done with Frank's estate. They were advised by competent counsel that Frank's estate passed by law to his father, Patrick. At that time included in the land held by Ella, belonging to the partnership, was 160 acres involved in this action which Frank had conveyed to her in 1895. All of the land so held, Ella conveyed by deed, June 1, 1904, to John for the recited consideration of "love and affection." In the land held by Frank, belonging to the partnership, was 240 acres involved in this action. All of the land so held by Frank was deeded by the father to John by deed dated June 8, 1904, for the recited consideration of "love and affection." By deed dated June 10, 1904, John and his wife conveyed the 400 acres of land involved in this action to Ella, by deed reciting a consideration of "love and affection." All of these deeds were prepared by Edward and all filed for record June 13, 1904. By these three conveyances the title to all of the partnership real estate was placed in John's name and the 400 acres here involved placed in Ella's name. Ella was at that time about 45 years of age. She then owned 80. acres of land that had been purchased for and conveyed to her. John and Frank paid one-half and Edward one-half the cost of that 80 acres. From that time on until her death Ella participated in the management of the land, sometimes Edward and sometimes John, leasing it for her, collecting the rents and accounting to her for them. No dispute ever arose between the three of them about it during Ella's lifetime. These facts are not

disputed. The dispute comes as to the conditions under which Ella held title to the 400 acres involved in this action.

John in 1903 married a widow, living in Humphrey, who had a considerable estate in her own right. John lived with his wife at Humphrey, and continued to maintain his business and the old home at Newman Grove for himself, his father and Frank. The record establishes that after Frank's death Mrs. John O'Shea went to a trusted friend of her husband and advised him that her husband, John, wanted to convey land to Ella. Mrs. O'Shea was concerned that she not involve her separate estate.

On June 10, 1904, John, Mrs. O'Shea and Ella were at the Humphrey home. John called the trusted friend, who was a notary public, to the home to witness and acknowledge the conveyance of the 400 acres to Ella. The notary testified, by deposition, that it was there agreed that the land was being conveyed to Ella, to hold with the understanding that if either John or his wife should become in need that they could have support from it (a contingency that never occurred); that Ella was to have support from it; that she was to will it to John if she (Ella) predeceased him, and that if he predeceased Ella it was to be Ella's without qualification. Reference will be made later to Edward's admission that that understanding existed. The notary further testified that at the time the deed was executed Ella agreed to these conditions. An attempt is made to discredit the notary's testimony by showing that in 1904 he too was holding title to land belonging to John and did not at first testify to that fact. However as we see it this evidence establishes the confidence that John placed in the notary in 1904.

When this action to quiet title was commenced, Edward's deposition was taken in the nature of discovery. He first explained the conveyance to Ella on the ground that it was a settlement of the interest that the "O'Sheas" had in Frank's estate. This did not prove tenable when it was revealed that an able lawyer had, prior to the deed, been consulted by Edward and John and had advised them that the

estate passed in its entirety to the father. It was further established that the other brothers were not consulted about the matter at the time, although living close by. It was then advanced that the conveyance to Ella was in accord with an agreement between John and his father, that Ella be cared for by this conveyance. Satisfactory evidence of that contention is not found in the record.

The next important evidence deals with the events in 1913 when Ella desired to and did make her will. Edward drew the will for her. He talked to his brother John about the will before it was drawn and in particular what disposition Ella should make of this 400 acres of land. Edward and John are in disagreement as to what was said, but in any event Ella on July 29, 1913, made her will, which exclusive of the opening and closing sentences contains the three following paragraphs:

"(1) I give and bequeath to my brother, John J. O'Shea, of Newman Grove, Nebraska, the following described real estate, situated in Madison county, Nebraska: (Here follows a description of the land involved in this action.) In case of the death of my said brother John J. O'Shea, during my lifetime, I direct that his share shall pass to my brother Edward O'Shea, mentioned in paragraph two of this my last will.

"(2) I give, devise and bequeath all the residue of my estate, real and personal, to my brother Edward O'Shea, charged with the payment of my debts. In case of the death of my said brother Edward O'Shea, during my lifetime, I direct that his share shall pass to my said brother John J. O'Shea, mentioned in paragraph one of this my last Will.

"(3) I hereby appoint my brothers John J. O'Shea and Edward O'Shea, or the survivor of them executors of this my last Will and testament, hereby revoking all former wills by me made."

It is to be noted that this will is in accord with the testimony of the notary, who acknowledged the 1904 deed, that Ella was to will this land to John. It contains a definite

expression of her desire that this land should pass to John free of her debts, for she charged the residuary devised to Edward "with the payment of my debts." This will was admitted to probate and is the unquestioned last will and testament of Ella O'Shea.

When his deposition was taken Edward was asked with reference to this will. The deposition was not offered in evidence, but the notary taking the deposition was called and the testimony offered as an admission against interest. In that deposition Edward admitted that when the terms of the will were being discussed, Ella told him it "was the understanding" that she was to will this land to John as against the possibility that she would predecease him. Later at the trial Edward undertook to explain this admission by saying that he understood the questions to refer to an agreement between himself and Ella that the will should be drawn so as to give John this 400 acres. The direct and cross-examination of Edward indicates a clear understanding of questions asked and answers given. The questions and answers directly involved are as follows:

"Q. Ella told you from time to time did she not, that John had made this deed to her to be a nest egg for her and to furnish support for him and his wife if something went against them, did she? A. At the time of the execution of this deed John O'Shea had married Mrs. Murphy and she was a well-to-do woman and he was a well-to-do man, and nothing was said about John O'Shea and his wife Mrs. Murphy O'Shea becoming unable to support themselves. No there was nothing of the kind. (It is noted that the denial here goes directly to the matter of support for John and wife.) Q. Was anything said about Ella making a will of this property to John back against the possibility she died first? A. I don't believe there was at that time. Q. In any event it was talked about at the time the will was made? A. It would look like it. Q. That was the fact, was it not? A. You have the same right to draw your opinion as I have. Q. Did not Ella tell you that was the understanding? A. I think she did. She signed that will

and I suppose that would be the understanding. Q. She told you that was the understanding, did she not? A. I don't recall that. Yes, I would say she did. Q. That was, she was to will that land back to John if she died first? A. At the time of the execution of the will? Q. Yes? A. I think that is true."

The language does not support the later explanation of it. The admission must stand as corroborative evidence of the notary of the 1904 "understanding" and as evidence of Edward's knowledge of it at least as early as 1913.

In the sequence of events the next evidence deals with the contention of the defendant that during the 1920's he and Ella had an "understanding" that if Ella died first Edward should have all of her property, and that if Edward died first Ella should have all of his property. To sustain this understanding Edward offered the testimony of three witnesses who related the statement made to them, by Ella, in the late 1920's, to the effect that "there was an understanding between her and Edward that when she went what she had was to be Edward's and when Edward went what he had was to be her's, if he went first." These were general statements. The witnesses state that Ella did not discuss her property nor refer to any particular property nor to the land involved in this action, nor did Ella say that this result was to be accomplished by deed or will although one witness testified that Ella in 1930 or 1931 said "a deed was considered very good because it settled everything and saved expense." They were discussing the settlement of an estate in which the witness, not Ella, was interested. One witness testified that in September, 1936, when starting on a trip Ella bade her goodbye and said "Well, you know, I might not be here when you get back. We're getting old. That's all right! I've everything fixed and everything is all right." Ella however made no reference then to the 1935 deed nor did she say what was "fixed" nor how it was "fixed." Her mental competency in September, 1936, is seriously questioned.

Another of the witnesses related that both Ella and Ed-

ward told him at different times that "they willed it to each other" or were "going to." This same witness relates a statement made to him by Ella in 1925 or 1926 "she did not say she was going to deed it or that she was going to will it, she said she was going to leave it." These likewise were general statements without discussion of holding or reference to any particular property.

On April 23, 1926, Edward knowing the provisions of Ella's will, for he drafted it, made his will in which, after the payment of his debts, he devised all of his property, including after-acquired property, to Ella. Ella's will (set out heretofore) had been made 13 years before. She did not, in 1926 nor thereafter, change it. We see no contradiction in the statements of these three witnesses with the contention of the plaintiff that he is the owner of this property, nor do they indicate that Ella considered this particular land to be hers. The question still remains as to whether or not this 400 acres of land was Ella's to give to Edward by deed, will or otherwise. The testimony of these three witnesses does not answer or touch that question. There is no question but that Ella was fully competent when these statements were made in 1928 or 1929 and 1930 or 1931. She at that time had willed this land to her brother John and permitted that will to stand until her death. We see nothing in this evidence other than support for the conclusion that both Edward and Ella understood that this 400 acres was John's after Ella's death, and had disposed of their property by will to each other accordingly.

In August, 1934, Ella suffered what may be termed a stroke. She apparently recovered from that and was able to perform her duties about the home and her church. It is not seriously disputed however that by the latter part of 1936 or 1937 she had become mentally incompetent and physically incapacitated and remained so until her death, as a result of arteriosclerosis. Edward at all times gave his sister Ella considerate and loving care.

On or before February 7, 1935, Edward prepared a deed from Ella to him whereby "in consideration of one dollar

and other valuable considerations" Ella conveyed to him (recited in the order named) city property in Madison, an undivided one-third interest in 320 acres of farm land, an 80-acre tract, and finally the land described in this action. On the morning of February 7, 1935, Edward and Ella drove to the office of a notary, who was then a tenant of Edward's in the city of Madison. The office was on the ground floor. The notary had not previously been consulted in the matter. Edward's brother Thomas and other relatives operated the bank close by where notaries were available. Ella entered the notary's office. Edward apparently remained outside. Ella asked "to have the deed notarized and she wanted to sign it." The notary was testifying on direct examination as a witness for the defendant. He was asked this question: "Q. Did she tell you at that time what that instrument was or what she was doing? · A. Yes, in this way. She said I'm deeding *some, or a part of my property to Ed O'Shea.*" After the deed was acknowledged it was handed to Ella who instructed the notary to hand it to Edward. He is not shown to have been present before, but at that time was at the door and some four or five feet away from the notary and Ella. Edward took the deed, helped Ella to the car and they drove away. Nothing was said then or thereafter to any of the relatives or others about the deed. John, without protest from Edward, continued to act as Ella's agent in renting a part of the land. On June 3, 1935, Edward executed a lease to a part of this land signing "Ella O'Shea by Edw. O'Shea" although he now claims to have then owned the property in his own right. Checks for rent were sent to Ella by John and were apparently indorsed by Edward for her. The 1936 taxes were paid by Edward by check on Ella's account in the bank. There was no change in the management of the property during Ella's lifetime. The deed conveyed to Edward all of Ella's holdings about which there is no dispute. Later Edward rented a safety box and opened an account in a Norfolk bank, closing out both his own and Ella's account in Thomas' bank at Madison. The money in Ella's account,

over $2,000, was transferred to Edward's account. Before her death Edward had taken over the control if not the ownership of everything that was Ella's including personal property originally belonging to John's first wife and which had been given to Ella. Before Ella's death Edward became unfriendly to his brothers, Peter and John, so that John felt obliged to discontinue his regular and frequent visits to Ella. There were "words" between John and Edward. Ella died February 23, 1938. Edward did not personally notify the brothers of her death. They learned of her death and attended the funeral. After Ella's death John rented the land in dispute and collected and retained the 1938 rents, without Edward questioning his right to do so until the close of the trial before Judge Stewart. Edward made no move to offer his sister's will for probate. John tried to find out from Edward about the will, without success. Finally John filed a petition for the probate of Ella's estate as an intestate estate. Edward then on September 30, 1938, produced the will and offered a petition for its probate. On the same day he filed for record the deed of February 7, 1935. It appears that that was the first knowledge that any of the interested parties, other than Edward, had of the existence of the deed.

By quitclaim deed dated October 25, 1938, Edward conveyed to John some 240 acres of land (not involved in this action) and two city lots in Newman Grove. This conveyance was requested by John and executed and delivered by Edward, it apparently being property belonging to John, title to which had been held by Ella. No mention seems to have been made at that time of this 400 acres nor is any agreement shown that this constituted a settlement. On February 25, 1939, John wrote Edward a short letter, inclosing a quitclaim deed for the land involved in this action which he asked Edward to sign, describing the land as that "mentioned in Ella's will, which she intended for me to have." Edward did not comply with John's request. The defendant argues that this letter does not mention the claim now advanced by John. Neither does it refute that claim.

It was obviously a letter written in the hopes of securing a friendly settlement. It was not successful and this litigation followed.

There is also in the record a letter written by John to Edward in October, 1905, suggesting that he had a purchaser for "one 80 of Ella's land" (being a part of that involved in this action) at a price which he thought would be "a good sale" and that "she could get something over near Madison for that money." He also suggested a piece of land that could be purchased. He asked for Edward's thought on the matter. Nothing came from it. We see no controlling weight in the letter. The matter proposed was, in effect, the substitution of one piece of land for another. That did not call for a discussion of, or a declaration of, the conditions under which Ella held the title.

We hold that this record establishes by evidence that is clear, convincing and satisfactory that the plaintiff and his wife conveyed this land to Ella O'Shea to hold during her lifetime; that she was to receive the income therefrom for her care and support; that plaintiff and his wife were to have support therefrom if needed; that Ella was to will this land to the plaintiff so that the fee title would be restored to him if Ella O'Shea predeceased him; and that if plaintiff predeceased Ella then and only then was the property to belong to Ella O'Shea absolutely. We further hold that by the same force the evidence establishes that there existed between the plaintiff and Ella O'Shea a close personal, business and confidential relationship, beginning years before the deed of 1904 was executed and delivered and continuing until the death of Ella O'Shea. We further find that the defendant Edward O'Shea was at all times fully cognizant of that confidential relationship and, at least as early as 1913, likewise knew the conditions under which Ella held title to the land, and that he took the title to the land in 1935 subject to those conditions and is bound thereby.

Sections 36-103 and 36-104, Comp. St. 1929, commonly known as the statute of frauds provides:

"No estate or interest in land, other than leases for a

term of one year from the making thereof, nor any trust or power over or concerning lands, or in any manner relating, thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same."

"The preceding section shall not be construed to affect in any manner the power of a testator in the disposition of his real estate by a last will and testament, nor to prevent any trust from arising or being extinguished by implication or operation of law."

These sections in substantially the present form were before this court in *Pollard v. McKenney*, 69 Neb. 742, 101 N. W. 9. This court there said: "But, by the express provisions of the fourth section, trusts arising by implication, or by operation of law, are excepted from the operation of the statute. Both resulting and constructive trusts obviously fall within the exception." It was there also held: "Closely allied to resulting trusts, and frequently confused with them, are constructive trusts. This class of trusts arises from actual or constructive fraud or imposition, committed by one party on another. 1 Perry, Trusts (5th ed.), sec. 166. Thus if one person procures the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds toward the owner of the legal title, obtains such title from him upon more advantageous terms than he could otherwise have obtained it, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. Again, if a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits; out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title." And also " * * * a promise made with the intention of not

performing it is fraudulent, but that the violation by the grantee of a promise to reconvey, is constructively fraudulent and gives rise to a constructive trust, which may be established by parol, if he obtains an absolute deed without consideration, by means of a parol agreement to reconvey to the grantor to whom he stands in the confidential relation, even where there be no intention at the time not to perform the promise." In the fourth paragraph of the syllabus it was said: "Where a person obtains the legal title to real estate belonging to another by means of fraud, actual or constructive, a court of equity will fasten a constructive trust upon the property, and convert the grantee or those claiming under him, by descent, into trustees of the legal title, and enforce the trust for the benefit of the grantor or those claiming under him." Upon rehearing it was held (p. 753): "A decree establishing a constructive trust should not be limited to a cancelation of the conveyance whereby the constructive trustee acquired title to the land; the trust should be ascertained and enforced." This case has been repeatedly followed as late as *Federal Trust Co. v. Ireland*, 124 Neb. 369, 246 N. W. 707.

A constructive trust has been defined as follows: "A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." 1 Restatement, Trusts, 5, sec. 1e. It is stated in the same authority that "Where the owner of an interest in land transfers it *inter vivos* to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if

"(a) the transfer was procured by fraud, duress, undue influence or mistake, or

"(b) the transferee at the time of the transfer was in a

confidential relation to the transferor." 1 Restatement, Trusts, 135, sec. 44.

This authority was accepted and followed by this court in *Wilcox v. Wilcox,* 138 Neb. 510, 293 N. W. 378; *Fisher v. Keeler,* 142 Neb. 728, 7 N. W. (2d) 659. See, also, 3 Pomeroy, Equity Jurisprudence (4th ed.) p. 2370; 1 Scott, Trusts, p. 253; 3 Bogert, Trust & Trustees, p. 1594.

Applying these principles to the facts as they clearly appear in this record it is held that the defendant Edward O'Shea holds title to the land involved in this action under a constructive trust for the plaintiff John J. O'Shea.

On this feature of the case the decree of the district court is reversed and the cause remanded with directions to enter a decree, in accord with this opinion, quieting title to said premises in the plaintiff and denying the defendant any right, title or interest therein or right of possession thereto, and placing the plaintiff in possession of the premises. Plaintiff also prayed for an accounting for rents and profits received prior to the beginning of the action and those thereafter received during the pendency of the action. Evidence was taken on that matter, but in view of the decree, no finding made by the trial court. It is probable that additional rents and profits have accrued and been collected by the defendant since the trial of this action. The trial court is further directed to hear the issue presented by the plaintiff's petition and prayer for rents and profits, to determine the amount, if any, found to be due the plaintiff from the defendant Edward O'Shea and to render judgment accordingly.

We now come to the second general question presented by this appeal and that is whether the cross-petition on the note should have been allowed. The original action was clearly one in equity to quiet title to the land in the plaintiff and to secure an accounting for rents and profits. The defendant by cross-petition sought to recover upon a promissory note dated June 6, 1938, and payable six months thereafter. It was alleged that the indebtedness evidenced by the note was for moneys loaned to John J. O'Shea by Ed-

ward O'Shea and Ella O'Shea in her lifetime, and that the note set out in the cross-petition was given for one in the same amount dated December 6, 1937, and that the note of December 6, 1937, was in turn given to evidence the total sums due on a number of notes, some payable to Ella and some to Edward. It is the same note upon which suit was originally brought by defendant as an independent action before the plaintiff brought his action to quiet title. It is conceded that the suit on the note was an action at law and ordinarily triable to a jury.

This court has long followed the rule that under our code the chancery practice has been so enlarged that an answer in the nature of a cross-petition may properly seek affirmative relief beyond that which is merely defensive, and such relief sought need not necessarily be based on equitable grounds if germane to the original action. *Armstrong v. Mayer,* 69 Neb. 187, 95 N. W. 51; *Gibson v. Koutsky-Brennan-Vana Co., ante,* p. 326, 9 N. W. (2d) 298. This court has further said: "But the matters set up in the cross-petition must be germane to the original suit. The cross-petition is not maintainable for purposes of affirmative relief as a cross-suit beyond the requirements of a complete adjudication upon the subject-matter of the original suit." *Armstrong v. Mayer, supra.* And "In an equitable action, a cross-suit must be germane to the original bill, and the issues thus introduced are limited to such as are necessary for the court to consider in deciding the questions raised in the original suit in order to do complete justice to all parties with respect to the cause of action on which plaintiff demands relief." *Higgins v. Vandeveer,* 85 Neb. 89, 122 N. W. 843.

In *Armstrong v. Mayer, supra,* it is said: "Hence, we are of opinion that a cross-petition is maintainable under the code, as a cross-bill would be in the chancery practice, either to aid *in the defense of the original suit,* where affirmative equitable relief is required to make such defense effective, or to obtain a complete adjudication of the controversies between the original complaint and the cross-

complaint *over the subject-matter of the original suit."*
(Italics ours.) "It is also required under the chancery
practice that the cross-suit be germane to the original suit.
The new issues which a defendant may introduce by cross-
bill are limited to such as it is necessary for the court to
have before it in deciding the questions raised in the origi-
nal suit in order to do complete justice to all parties with
respect to the *cause of action* on which the plaintiff bases
his claim for relief." " * * * the matters set up in the
cross-petition must be germane to the original suit under
the code, quite as much as under the chancery practice."
" * * * a cross-petition is not maintainable for purposes of
affirmative relief as a cross-suit beyond the requirements
of a complete adjudication upon the subject-matter of the
original suit. New and distinct matter, not maintainable
under the provisions of the code as to counterclaims, and
not involved in a proper determination of the subject-mat-
ter of the original suit, must be litigated in a separate ac-
tion. When it is said that a court of equity will administer
complete relief and adjudicate all controversies between the
parties, the meaning is that a complete decree will be ren-
dered with reference to the immediate subject-matter of
the original suit. The subject-matter of that suit will not
be dealt with piecemeal. It is not meant that all causes of
action between the parties, or some of them, will be dis-
posed of in the one cause where they are not involved in a
complete disposition of the subject-matter of the bill."

We are unable to see any basis upon which it can be held
that the cross-petition upon the promissory note is germane
to the action to quiet title to land.

It necessarily follows that the trial court did not err in
its original order sustaining the motion to strike the cross-
petition wherein the defendant sought, in the equity action,
to recover a judgment on the note, and that the trial court
subsequently erred when it permitted, over objection, the
filing of an amended cross-petition praying for recovery on
the note. The objections of the plaintiff have been pre-
served. It is held that the defendant was not entitled to

maintain his cross-petition on the note and should have been remitted to a separate and independent action at law.

On this feature of the case the judgment of the district court awarding the defendant a money judgment is accordingly reversed and remanded with directions to sustain the motion to strike the cross-petition seeking recovery on the note.

REVERSED, WITH DIRECTIONS.