EMANUIL WISKOCIL ET AL., APPELLANTS, v. WILLIAM KLIMENT, APPELLEE.

50 N. W. 2d 786

Filed January 4, 1952. No. 33040.

*Phillip A. Tomek* and *John G. Tomek,* for appellants.

*H. A. Bryant,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs brought this suit in equity to cancel a deed to 240 acres of described farm land, have title quieted thereto as against defendant, and for an accounting. Defendant denied generally plaintiffs' right of recovery, and prayed for dismissal of the action. After a hearing upon the merits, the trial court rendered its decree, finding generally for defendant, substantially upon the ground that defendant's promise to purchase the land for plaintiffs and convey it to them upon repayment of the balance of the purchase price was oral, thus within the statute of frauds, and that in any event the promise had been withdrawn. Nevertheless, the decree permitted plaintiffs to have an accounting, and ordered that each party should pay his own costs. Plaintiffs' motion for new trial was overruled, and they appealed, assigning

that the judgment was not sustained by the evidence but contrary thereto and contrary to law. We sustain the assignments. Hereinafter, plaintiffs, when spoken of separately, will be respectively called Emanuil and Joseph.

In such cases, the general rule is that: "Actions in equity, on appeal to this court, are triable de novo in conformity with section 25-1925, R. R. S. 1943, subject, however, to the rule that when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite." Sopcich v. Tangeman, 153 Neb. 506, 45 N. W. 2d 478. In that regard, however, the version accepted must be supported by credible evidence. In other words, this court is not required by such rule to believe the unbelievable. See, also, Maddox v. Maddox, 151 Neb. 626, 38 N. W. 2d 547, wherein it was held: "The foregoing rule is not abrogated by, but must be construed in the light of the rule that the burden of proof is upon one seeking to establish and enforce a constructive trust to establish the same by a preponderance of evidence, clear, satisfactory, and convincing in character."

Bearing that in mind, we have examined the record. It discloses that plaintiffs are unmarried brothers. They were both born on the land involved, and lived there all their lives working and farming the land. Plaintiffs did not know the date of their birth or the date of the death of their parents, but it appears that Emanuil was about 45 and Joseph was over 60 years of age at the time of trial. They had but little education, and their physician, who had personally known them for four or five years, testified that from his professional examinations, technical mental tests, and observation, Emanuil, born mentally incapacitated and subject to influence, had the mental capacity of a child seven or

eight years old, and that Joseph had the slightly higher mental capacity of a child eight or nine years old. He classified both of them as low morons. An unmarried brother, who lives with plaintiffs, is physically unable to work, and "not right in the head," having lost his mind in 1942.

On December 9, 1936, plaintiffs jointly owned the land involved. However, on that date Emanuil, who was the record title owner, gave the Prudential Insurance Company, hereinafter called the company, a mortgage on all the land to secure a 10-year loan of $11,400, with interest and $500 on the principal, both payable annually. Years of drought, poor crops, and low prices made it impossible for them to make the payments in 1938. Thereupon the company started foreclosure proceedings, and on February 18, 1944, it received a sheriff's deed to the land.

Prior thereto plaintiffs negotiated with the company to repurchase the land. They later made a written offer to purchase the same for $15,600, and paid the company $1,000 as part payment thereof. The offer was approved and accepted by the company in writing on June 7, 1944.

In the meantime, plaintiffs proceeded to secure the money with which to pay the company. They were able to raise but $4,100 in cash. To raise the balance of $11,500 they entered into an oral agreement with a neighbor, one Dolezal, whereby he was to purchase for himself one 80 acres of the land, and loan plaintiffs sufficient additional money to complete their purchase of the other 160 acres. However, Dolezal was to take a deed to all the land as security for his loan to plaintiffs. Plaintiffs desired to keep all the land for themselves, but nevertheless, pursuant thereto, Joseph and Dolezal went to Omaha and separately made written offers to the company, duly accepted, whereby Emanuil was to purchase a described 160 acres of the land, and Dolezal was to purchase a described 80 acres thereof. The lat-

ter's offer, as provided therein, was "made with the understanding that the sale of" the other described 160 acres "to Emanuil Wiskocil is to be completed in conjunction with this sale. In event said sale to the said 160 A. is not consumated (sic) this offer to be cancelled," which statement, together with other evidence adduced, verified plaintiffs' testimony with regard to such transaction.

Shortly thereafter, defendant, an apparently friendly near neighbor, who often came to plaintiffs' farm borrowing tools and visiting with or advising them, went to see plaintiffs. Having heard about their arrangements with Dolezal, defendant then and there told them to cancel the arrangement and not have anything to do with Dolezal, because he would never permit plaintiffs to pay the loan and would never reconvey the land to plaintiffs as promised, but that he, defendant, would advance the money needed and purchase all of the land for plaintiffs. Defendant said he would see Dolezal for them, so plaintiffs went with defendant in his car to see Dolezal and there informed him that the deal with him was cancelled, and to meet them in Omaha at the company's office at an appointed time and cancel their contracts. At such appointed time defendant took Joseph with him in his car to Omaha, where they met Dolezal in the company's office and such contracts were cancelled, upon defendant's promise that he would make an offer and enter into a contract to purchase all of the land from the company for plaintiffs, pay the balance above what plaintiffs could raise, take title as security therefor, turn the land over to plaintiffs as owners, and convey it to them when he was paid, with interest at 4 percent.

In pursuance thereof defendant executed a written offer to purchase the land for $15,600. The offer was on a regular printed form, but therein, with regard to the right to possession by defendant, there had been typed a separate sentence to the effect that it was "subject to

the rights of the parties now in possession." The offer was accepted, whereupon plaintiffs paid $4,100 directly to the company upon the purchase price, and received a receipt therefor from the company. Defendant paid $11,500 and received a warranty deed to all the land on July 25, 1944. He never then or thereafter offered plaintiffs any security for the $4,100 paid by plaintiffs, or offered to pay interest thereon as if it were a loan to him.

The promises heretofore recited as made by defendant were reiterated by him in his car on the road back home. Twice during the trial defendant admitted that he had made the same, and after this suit was started he told plaintiffs he would give them 80 acres if they would drop the case.

There the matter rested for sometime until the spring of 1946. During all of the period here involved, plaintiffs maintained and retained full and complete possession and dominion over all the land as owners. They rented part of the land to defendant, and as directed by defendant, collected and retained pasture rents. Without direction of or at his request, plaintiffs, at their own expense, repaired and made permanent and substantial improvements to the fences, buildings, and land.

During 1945, plaintiffs paid defendant $614.78 in cash to apply on principal, interest, and taxes. Likewise, in April 1946, they paid him $300 in cash. Likewise, on October 16, 1946, they paid him $500 by check, which check appears in the evidence bearing defendant's endorsement. That payment defendant admitted receiving, and the trial court specifically found that all the aforesaid payments had been made by plaintiffs and credited such amounts to them in the accounting.

In the spring of 1946, defendant secured permission from plaintiffs to farm 23 plowed acres of the land which had been previously planted to sweet clover for two years, upon the promise that he would credit two-fifths rent share of crops raised thereon by him upon prin-

cipal, interest, and taxes paid by him. Under that arrangement defendant thereafter continued to rent from plaintiffs and farm such land. In 1946 such two-fifths share received by him amounted to $1,395.34. In 1947 such crop share, plus one-half the hay taken by defendant from 60 acres, as per oral agreement with plaintiffs, amounted to $1,194.75. In 1948 such share amounted to $890, and in 1949 it amounted to $900. The trial court specifically found that such amounts should be credited to plaintiffs in the accounting.

On April 8, 1946, defendant, being in ill health and believing he might die, came to plaintiffs' home and took them in his car to Wahoo, where, in order to do the right thing, as he had agreed, defendant delivered Emanuil a warranty deed to all the land, which deed was duly recorded. The consideration recited therein was "One Dollar and Love and Affection." At the time of its execution, plaintiffs paid defendant in cash the one dollar consideration recited in the deed, and, at his request, gave him all the money they had, $300 in cash, an amount for which the trial court gave them credit in the accounting. Whether plaintiffs were to get a loan and pay defendant the balance then due him as contended by defendant, or could pay him the balance little by little, as contended by plaintiffs, is of little importance in light of the fact that he did give them a deed as he had promised to do.

Thereafter, however, on April 24, 1946, defendant again came to plaintiffs' farm, where by promises, force, and threats, he induced plaintiffs to go with him in his car to Wahoo, where Emanuil deeded the land back to defendant, who told them not to tell anybody about the transaction or worry, because the farm was still theirs, and they thereafter continued in possession as such at all times in the same manner heretofore recited. The consideration recited in that deed was also "One Dollar and Love and Affection" and there was no other consideration recited or given by defendant.

Defendant in one breath contended that the $4,100 paid by plaintiffs directly to the company was a loan to him at 4 percent, although no interest was ever paid thereon by defendant and no security was ever asked, offered, or given therefor, and in the next breath contended that it was by oral agreement with plaintiffs for rent of the land paid in advance, at five dollars per acre. However, in the light of his own testimony, buttressed by unequivocal facts and circumstances, it appears conclusively that it was neither the one nor the other, but rather was in fact money "advanced on purchase price of land" by plaintiffs, as found and credited by the trial court in its decree of accounting. Likewise, defendant's general denial of plaintiffs' testimony and his equivocal contention that he purchased the land solely for himself and not for plaintiffs, and that he had at all times dealt fairly with them upon that basis, lacks any credence, and a court of equity will not permit defendant to so fraudulently enrich himself at plaintiffs' expense.

Plaintiffs were ultimately able to raise sufficient money to pay defendant in full, which he refused to accept. This action was brought and payment thereof was tendered into court for defendant's benefit. Both plaintiffs and defendant offered evidence with regard to an accounting. The lapse of time and failure of both parties to keep adequate and complete records, makes exactness difficult, but plaintiffs admitted that at the time of trial they were indebted to defendant in the sum of $8,843.11, for principal, interest, and taxes, and in the light of the evidence we conclude that such sum was the correct amount then owing defendant.

In the light of such a situation as that heretofore recited, the law is well established.

In Scott v. Swank, 132 Neb. 720, 273 N. W. 25, this court held: " 'Although mental weakness may fall short of entire incompetency to transact business, if it is taken advantage of to procure a conveyance by inequitable

means, the conveyance may be set aside.' Bennett v. Bennett, 65 Neb. 432, 91 N. W. 409.

" 'A court of equity will scrutinize jealously a transaction as to which there is ground for holding that influence has been acquired over a person of weak mind, and has been abused.' " See, also, Bennett v. Bennett, 65 Neb. 432, 91 N. W. 409.

On the other hand, it has long been the rule that: "The statute of frauds can only be invoked to avoid an oral contract in case one is free from deceit and false representations." Griffin v. Bankers Realty Investment Co., 105 Neb. 419, 181 N. W. 169. See, also, Hecht v. Marsh, 105 Neb. 502, 181 N. W. 135, 17 A. L. R. 1, and Dickson v. Stewart, 71 Neb. 424, 98 N. W. 1085, 115 Am. S. R. 596. In such last-cited case it is said: "And he also overlooks another very important proposition: That a court of equity will never permit a party to shield himself behind a statute of frauds in order to perpetrate a fraud." See, also, Koefoed v. Thompson, 73 Neb. 128, 102 N. W. 268.

In any event the statute of frauds has no application here. In Jenkins v. Jenkins, 151 Neb. 113, 36 N. W. 2d 637, this court said: " 'A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.' O'Shea v. O'Shea, 143 Neb. 843, 11 N. W. 2d 540. See, also, Wilcox v. Wilcox, 138 Neb. 510, 293 N. W. 378; Box v. Box, 146 Neb. 826, 21 N. W. 2d 868; Pollard v. McKenney, 69 Neb. 742, 96 N. W. 679, 101 N. W. 9; 1 Restatement, Trusts, p. 5, § 1e.

"The law is well established that each case is to be determined from the facts, circumstances, and conditions as presented therein. See, Damkroeger v. James, 95 Neb. 784, 146 N. W. 936; Lennox v. Anderson, 140

Neb. 748, 1 N. W. 2d 912; Lunkwitz v. Guffey, 150 Neb. 247, 34 N. W. 2d 256.

"Sections 36-103 and 36-104, R. S. 1943, constitute a part of the statute of frauds. The former section recognizes the creation of an interest in land 'by operation of law.' The latter section provides that section 36-103 shall not be construed in any manner to prevent any trust from arising by implication or operation of law. Thus, trusts arising by implication or operation of law are excepted from the operation of the statute of frauds. See, O'Shea v. O'Shea, *supra;* Pollard v. McKenney, *supra.*"

In Lamb v. Sandall, 135 Neb. 300, 281 N. W. 37, following Johnson v. Hayward, 74 Neb. 157, 103 N. W. 1058, 5 L. R. A. N. S. 112, this court held: " 'Where one employed to act as the agent for another in the purchase of real estate becomes the purchaser himself, he will be considered in equity as holding the property in trust for his principal, although he purchased with his own money, subject to reimbursement for his proper expenditures in that behalf.' " See, also, Maddox v. Maddox, *supra.*

In Johnson v. Hayward, *supra,* it was also held: "A contract whereby one person employs an agent to negotiate for the purchase of real estate is not a contract for the creation of an estate or interest in land, or trust or power over or concerning lands, etc., within the meaning of the statute of frauds."

In the light of the foregoing evidence and rules we conclude that plaintiffs have clearly established a constructive trust, and that for the reasons heretofore stated the judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to render a judgment in conformity with this opinion, requiring defendant to convey the land to plaintiffs by a warranty deed, or, upon his failure or refusal to do so, the deed of April 24, 1946, shall be cancelled and title to the land quieted in plaintiffs absolutely

against all claims of defendant, upon condition that plaintiffs shall pay $8,843.11, together with interest thereon at 6 percent from date of judgment on the mandate, into court for defendant's benefit, within 60 days from date of judgment on the mandate. All costs are taxed to defendant, both in this court and in the district court.

REVERSED AND REMANDED WITH DIRECTIONS.