519 F.2d 578
 DODGE MOTOR TRUCKS, INC., a corporation, Plaintiff-Appellee,
v.
FIRST NATIONAL BANK OF OMAHA, a corporation, Defendant-Appellant.
DODGE MOTOR TRUCKS, INC., a corporation, Plaintiff-Appellant,
v.
FIRST NATIONAL BANK OF OMAHA, a corporation, Defendant-Appellee.
 Nos. 74-1858, 74-1859.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 13, 1975.
Decided July 10, 1975.
 
 Harry B. Otis, Omaha, Neb., for 1st Nat'l Bank of Omaha.
 William T. Oakes, Omaha, Neb., for Dodge Motor Trucks.
 Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 In this diversity action arising out of the purchase of four vehicles by Midwest Mail Service, Inc. (Midwest) from Dodge Motor Trucks, Inc. (Dodge), defendant First National Bank of Omaha, Inc. (Bank) appeals from the district court's[1] memorandum and order imposing a constructive trust on the four vehicles in question. The district court held that the Bank had a first lien on the vehicles as constructive trustee for plaintiff Dodge for the amount of the purchase price less the money received from Midwest in the bankruptcy proceedings, or $22,207.08. The constructive trust lien was imposed as of the date of the court's order, September 26, 1974. The parties agree that the value of the lien was $3,750.00 on that date. We reverse.
 
 
 2
 Dodge filed a cross-appeal claiming the constructive trust lien should have been imposed as of the date of the purchase of the new trucks which then had a value of $24,138.18. Since we agree with the appeal by the Bank charging that the court erred in imposing a constructive trust lien we need not reach the cross-appeal.
 
 
 3
 Dodge, a corporation, brought the original action against Bank, a corporation, to impose a constructive trust as a result of the sale of four trucks in August and September of 1972. Dodge is a seller of Dodge trucks and in April, 1970, proposed to sell some trucks to Midwest, a corporation, through Mr. Roger Freyer, its president. In the course of negotiating the sale, Dodge sent a letter, dated April 24, 1970 to the Bank stating that Mr. Freyer was interested in purchasing trucks and requested information regarding the availability of financing a number of pieces of equipment for Mr. Freyer.[2]
 
 
 4
 On April 29, 1970, the Bank replied by a letter signed by Mr. D. W. Ryan, vice president, which read in pertinent part:
 
 
 5
 We do have a commitment to Mr. Freyer that we will take care of his needs. While we are not able to set a specific amount, I am sure that we will be able to handle any purchase he may make from your firm.
 
 
 6
 Allegedly relying upon the Bank's letter, Dodge thereafter dealt with Mr. Freyer and Midwest as a valued customer and sold trucks to Midwest on open account. There was no further communication between Dodge and the Bank until after the difficulties arose which are the subject of this suit. From May, 1970 through September of 1972 Dodge sold about 20 trucks to Midwest, in many instances prepaying license, sales and wheel taxes and in each instance issuing "clean" certificates of title in the name of Midwest. Dodge was always paid with Freyer's check within what Dodge considered to be a reasonable time after delivery of the vehicles. At no time was Dodge paid directly by a check from the Bank or by a check from the Bank made out jointly to Midwest and Dodge.
 
 
 7
 On August 10, 1972, the Bank loaned $57,100.00 to Midwest and combined this loan with its previous indebtedness. As president of Midwest, Freyer signed a note evidencing the total indebtedness to the Bank of approximately $150,000.00 and simultaneously delivered to the Bank a memorandum describing the various motor vehicles to be purchased.[3] The loan was to be secured by a security interest in the vehicles, some of which were already owned by Midwest and some of which were to be acquired by Freyer in the future. Freyer and the Bank agreed that as soon as Freyer received the certificates of title for the new vehicles, he would bring them to the Bank so the Bank's security interest could be noted thereon in accordance with Nebraska law.[4]
 
 
 8
 Despite the fact that Freyer had already received cash with which to purchase the new vehicles, he continued to buy trucks on open account from Dodge. Between August 31 and September 15, 1972, Dodge delivered the four vehicles in question and their certificates of title to Mr. Freyer without receiving payment or obtaining a security interest in the vehicles. The total purchase price including prepaid license fees, property taxes, etc., was $24,138.18 and no payment was made by Midwest. Freyer brought the certificates of title to the Bank, which noted its security interest on the certificates and took them as collateral for the loan.
 
 
 9
 Soon after this, Midwest went into bankruptcy proceedings and is currently operating under Chapter 11 of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1970). The Bank was first advised by Dodge at a meeting in March, 1973, that the four units in question had not been paid for by Midwest. Dodge filed a proof of an unsecured claim against Midwest for the unpaid purchase price and received therefrom $1,931.10 (approximately 8%) as payment in full. The vehicles are still being used by Midwest in its business.
 
 
 10
 Dodge filed this suit in an attempt to hold the Bank liable for the difference between the purchase price and the amount received from Midwest in the bankruptcy proceedings. This appeal followed the district court's determination that the Bank held a secured lien on the vehicles as constructive trustee for Dodge, and thus Dodge was entitled to the amount of the purchase price less the amount received in the bankruptcy proceedings or $22,207.08. (However, as previously indicated the district court imposed the lien as of September 26, 1974, when the value was $3,750.00).
 
 
 11
 The initial consideration is whether the letter from the Bank in April, 1970, created an obligation on the part of the Bank to insure that Freyer (Midwest) had the money to purchase the vehicles or to loan Freyer the money to pay Dodge.
 
 
 12
 In general a constructive trust is an equitable device which arises in favor of a person entitled to money or property obtained by another through misrepresentation, bad faith or fraud. See, e. g., United States v. Fleming, 69 F.Supp. 252, 261 (N.D.Iowa 1946); Pennsylvania Mut. Life Ins. Co. v. Miller, 32 F.Supp. 206 (W.D.Mo.1940); Musil v. Beranek, 160 Neb. 269, 69 N.W.2d 885 (1955); Peterson v. Massey, 155 Neb. 829, 53 N.W.2d 912 (1952). In Box v. Box, 146 Neb. 826, 835, 21 N.W.2d 868, 873 (1946), the Nebraska Supreme Court stated that:
 
 
 13
 (I)t is well established that: "a constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." Restatement of the Law, Trusts, ch. 1, § 1, comment e, p. 5.
 
 
 14
 See also Musil v. Beranek, 160 Neb. 269, 69 N.W.2d 885 (1955); Pollard v. McKenney, 69 Neb. 742, 96 N.W. 679 (1903).
 
 
 15
 In order that one may be held as a constructive trustee of money or funds coming into his possession or under his control, there must be some element of wrong or violation of duty. Cotte v. Sands, 54 App.D.C. 396, 298 F. 1011 (1924); Tuttle v. Wyman, 146 Neb. 146, 18 N.W.2d 744 (1945); O'Shea v. O'Shea, 143 Neb. 843, 11 N.W.2d 540 (1943); Pollard v. McKenney, 69 Neb. 742, 96 N.W. 679 (1903). Usually to be a constructive trustee one must have notice that the property or money is being misapplied by being transferred to him or, in other words, he must be party to a fraud or breach of trust on the part of the actual trustee. Frier v. J. W. Sales Corp., 261 App.Div. 388, 25 N.Y.S.2d 576 (1946). See also United States v. Fleming, 69 F.Supp. 252 (N.D.Iowa 1946) and 89 C.J.S. Trusts § 152. In the present case there is no evidence of fraud or absence of good faith on the part of the Bank. Furthermore, the district court found that the Bank did not have actual notice of the fact that the titles being transferred to it by Midwest had been obtained without payment to Dodge.[5] Thus, it appears on the surface at least, that this is not a proper case for the imposition of a constructive trust.
 
 
 16
 However, the district court did hold later in its memorandum opinion that the Bank had constructive, if not actual, notice that Dodge had not been paid for the vehicles, stating as follows:
 
 
 17
 When the Bank received the certificates of title from Freyer, it had constructive, if not actual, knowledge that the vehicles had not yet been paid for. Since the Bank was engaged in the financing of new vehicles, it was or should have been aware of the general business practice of truck dealers in the metropolitan-Omaha area to sell vehicles on open account and to issue a certificate of title in the name of the buyer. It knew or should have known that Dodge Motor Truck planned to sell the vehicles to Freyer on credit since the letter from Dodge had inquired about Freyer's credit. Having answered the credit inquiry affirmatively, the Bank knew or should have known that the trucks obtained from Dodge had been purchased on credit. The Bank may not complain, therefore, that it did not know that the vehicles had not been paid for when it received the certificates of title. It should have been aware of Dodge Motor Truck's prior interest in the vehicles even though none was noted on the certificates of title.* * * When the certificates of title were surrendered to the Bank, at the very least the Bank should have inquired of Dodge whether it had been paid. Not having done so, and with notice of Dodge's prior interest in the vehicles, the Bank's action in obtaining a first lien on the property at Dodge's expense was inequitable. See 89 C.J.S. Trusts § 152.
 
 
 18
 The Bank convincingly argues that its letter in stating it has a "commitment" to a customer is not a letter of credit, guarantee or promise to pay the debt of another. A letter of credit is in the nature of a negotiable instrument, and is a letter whereby a person requests another to advance money or give credit to a third person and promises to repay the person making the advancement. Second Nat'l Bank v. Samuel & Sons, 12 F.2d 963, 966 (2d Cir. 1926).
 
 
 19
 While no set form of words is necessary to create a letter of credit, it must contain the essential elements. See Liggett v. Levy, 233 Mo. 590, 136 S.W. 299 (1911). It must fill the office of a request, general or special, to pay the bearer or person named money or sell him some commodity on credit, or give him something of value, and look to the drawer of the letter for recompense, and it must partake of the nature of a negotiable instrument. Liggett v. Levy, 233 Mo. 590, 136 S.W. 299, 302 (1911). In its entire course of dealing with Midwest, Dodge never looked to the Bank for direct payment. Therefore, the letter in question is obviously not a letter of credit and it is a misnomer to speak of it as such.
 
 
 20
 In In re Estate of Williams, 148 Neb. 208, 26 N.W.2d 847, 851 (1947) the Nebraska Supreme Court held that "a guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of the default of another person who is liable for such payment or performance in the first instance." In the present case there is not the slightest indication that Bank was expected to answer for Midwest if it were to default in its payments; the Bank at the most obligated itself to loan money to Midwest to buy vehicles if Midwest chose to buy.
 
 
 21
 In the present case there is a definite lack of the elements necessary to constitute either a letter of credit or a guaranty. The Bank neither promised nor agreed to pay Dodge for its purchases. Likewise, the Bank neither issued a check to Dodge on behalf of Midwest nor made joint checks to Midwest and to Dodge for purchases. The letter of the Bank to Dodge in April, 1970, merely advised Dodge that the Bank had a commitment to Freyer to take care of his needs and without setting a specific amount, was confident it would be able to handle his purchase from Dodge. The Bank, in fact, did loan money to Midwest and the purchases to which the letter referred were consummated over a two year period.
 
 
 22
 It should be noted that Dodge could have avoided its loss by pursuing a reasonable course of business dealing. Dodge issued to Midwest certificates of title without noting a lien thereon, and delivered possession of the motor vehicles in question, notwithstanding that Dodge had not been paid. Thus, Dodge failed to take advantage of the protections afforded by the Nebraska statutes to establish a security interest in goods sold to insure payment.
 
 
 23
 Although Dodge waived its statutory procedure to insure payment Dodge asserts that it was a trade custom to sell to valued customers on open account. To bind the Bank to the trade custom it was necessary for Dodge to prove that the Bank had actual knowledge of the custom and contracted in reference thereto or that the custom was so widely and generally known, and so well established, that knowledge thereof may be presumed. E. g., Frankel v. Pitlor, 166 Neb. 219, 88 N.W.2d 770 (1958); State ex rel. Sorensen v. Nebraska State Bank, 120 Neb. 539, 234 N.W. 82 (1931). The difficulty here is that Dodge utterlyfailed to establish any custom or practice on the part of banks or this Bank to monitor customers' accounts for the purpose of determining that loan proceeds were used for the purpose asserted.
 
 
 24
 Furthermore, Dodge made no additional inquiries to the Bank about Midwest's credit after the original letter and purchase and conducted no independent investigation of Freyer's credit and financial standing. Dodge, as a reasonable merchant, should have realized that a company which is financially sound at one point may not be worthy of credit a short time thereafter.
 
 
 25
 Even if the letter of April, 1970, from the Bank did create a confidential relationship the breach of which could lead to the imposition of a constructive trust, the Bank contends that the passage of two years between the writing of the letter and the contested purchase makes the reliance by Dodge on the letter as an inducement to sell to Midwest on credit unjustifiable.
 
 
 26
 In Liggett v. Levy, 233 Mo. 590, 136 S.W. 299, 303 (1911) it was said:
 
 
 27
 To sum up, there must be such a natural connection between a letter of commendation and the acts complained of that the one may be seen to bear the relation of a proximate cause to the other. It is elementary that to be actionable an injury must be a natural sequence of the wrongful act. Here the specific damage is not the reasonable result of the letter. True one followed the other. But merely because the letter preceded the injury and the injury followed hard on the heels of the letter does not establish the relation of cause and effect. Post hoc ergo propter hoc must be weighed carefully, for it may be fallacious reasoning.
 
 
 28
 The reasoning of the Liggett case is applicable here and in addition the complained-of transaction did not "follow hard on the heels" of the letter from the Bank, but rather over two years later. Significantly, Dodge no longer had the letter in its possession. This indicates that if Dodge ever relied on the letter from the Bank as the basis of its decision to extend credit to Midwest, such was no longer the case.
 
 
 29
 The obvious cause of Dodge's decision to sell on credit to Midwest and consequential injury was the course of dealing between Midwest and Dodge over the two year period. Although the letter may have induced Dodge to make the first sale to Midwest on credit in May, 1970, it does not necessarily follow that it also induced the sale of four vehicles on open account in August and September of 1972. It is more likely that Dodge sold to Midwest on open account because of Midwest's consistently prompt payments on previous purchases rather than in reliance upon a vague, general, open-ended letter written two years previously and no longer in Dodge's possession.
 
 
 30
 Assuming arguendo that a confidential relationship was created by the Bank's letter and that it was still in effect in September, 1972, because it had not been specifically rescinded by the Bank, it must still be determined if the confidential relationship was breached by the Bank.
 
 
 31
 This relationship was not breached because the Bank did exactly what it said it would do in its letter of April, 1970, namely, it loaned Midwest $57,100.00 with which to purchase vehicles. The letter in no way guarantees direct payment to Dodge and what Roger Freyer did with the $57,100.00 he received from the Bank on Midwest's behalf only he knows.[6] Dodge at no time dealt directly with the Bank regarding any of Midwest's purchases.
 
 
 32
 Dodge asserts that the Bank, in contravention of its usual course of dealing with Midwest, did not loan Midwest money to purchase the four vehicles involved in this dispute. However, according to Roger Freyer's handwritten memorandum given to the Bank on August 10, 1972, considered in conjunction with the invoices of the transactions between Freyer and Dodge in August and September of 1972 the loan made by the Bank to Freyer in August, 1972, for $57,100.00 was to include the purchase of four vehicles of the exact make, model and purchase price which were in fact purchased from Dodge in August and September of 1972. There is no evidence that the Bank knew that any of the vehicles were to be specifically purchased from Dodge and therefore there was no duty incumbent upon the Bank to inquire whether Dodge had been paid or to be aware of Dodge's interest in the vehicles.
 
 
 33
 The Bank's evidence discloses that money was often loaned to Midwest before the purchase and the vehicles were pledged as collateral for the loan. Then, after the purchase, Freyer would bring in the certificates of title for the new vehicles as soon as he received them for notation of the Bank's liens. The Bank's conduct in the disputed transaction was no different from the previous transactions. The burden was on Dodge to prove that the Bank behaved differently in this transaction and did not conform to the statements in its letter to Dodge in April, 1970. Dodge failed to show that the Bank's course of conduct for the complained-of transaction was any different from previous transactions. There is no evidence in the record that Freyer asked for more money when he brought the titles to the Bank for them to note their liens or that Freyer ever asked for the return of the four titles in question.
 
 
 34
 There was no action by Dodge which shows that it was relying on the Bank to pay them or that the Bank failed to make out a check in the manner which was expected of it. Mr. Honig of Dodge testified that on the other purchases Dodge had no knowledge whether the money paid to it by Midwest came from a bank loan or from Midwest's cash resources and at no time over the two and one-half year period in question did Dodge call the Bank or follow any other course of conduct which demonstrated Dodge's continued reliance on the Bank's judgment of Midwest's financial responsibility.
 
 
 35
 What happened in this case is that both the Bank and Dodge trusted Midwest and both were injured financially as a result. Although the trial court was correct in finding that the Bank's letter indicated that it was willing to meet Midwest's financial needs, it did do that it furnished the money. The Bank had not issued a letter of credit, guarantee, or otherwise promised to pay the debt of Midwest to Dodge or any other creditor of Midwest. Therefore the Bank did not owe a duty to Dodge to assure that the loan it had made was used for any particular purpose.
 
 
 36
 Dodge simply sold on open account with the understanding that the Bank was furnishing the financing, but Dodge was relying on its customer, Midwest, to actually make the payments for the trucks. Dodge never received checks directly from the Bank nor checks from the Bank made jointly to Dodge and to Midwest. Dodge depended entirely and directly on Midwest.
 
 
 37
 We are satisfied the district court erred in holding that the Bank had a duty to ascertain whether Dodge had been paid before placing its lien on the vehicles in question.
 
 
 38
 Reversed and remanded with directions to enter judgment in favor of the First National Bank of Omaha on the claim of Dodge Motor Trucks, Inc. The cross-appeal of Dodge Motor Trucks, Inc. is dismissed.
 
 
 
 *
 The Honorable Talbot Smith, Senior District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Honorable Albert G. Schatz, Judge, United States District Court for the District of Nebraska
 
 
 [2]
 The letter was addressed to Don Ryan, vice president of the Bank, and read as follows:
 I have been contacted by Roger Freyer, Midwest Mail Service, Inc., regarding a purchase of sizeable amount of truck equipment for an expansion of his operation.
 I would like to clear with you the availability of financing a number of pieces of truck equipment for Mr. Freyer. I would appreciate your reply as soon as possible.
 The letter was signed by Don Honig, General Sales Manager of Dodge.
 
 
 [3]
 This memorandum was handwritten by Mr. Freyer and was introduced as evidence at the trial as defendant's exhibit 35. It lists thirteen vehicles and describes them as to make, model, and purchase price. The list included the four Dodge trucks in issue. It also contains the total amount to be loaned ($57,100.00) and notes that the loan had been approved by Mr. Ryan August 10, 1972 and that the titles were to be brought in to the bank
 
 
 [4]
 Neb.Rev.Stat. § 60-110 requires liens on motor vehicles to be noted on the face of the certificate of title
 
 
 [5]
 The district court at p. 2 of its memorandum opinion (unpublished) stated as follows:
 Freyer brought the certificates of title to the Bank which, ignorant of the fact that they had not been paid for, noted its security interest on the certificates.
 
 
 [6]
 Appellee's brief indicates Freyer was present throughout the trial but was not called as a witness