ELIZABETH FRANCES BOX, APPELLEE, V. WALTER G. BOX ET AL., APPELLEES, AND STELLA MAE MCLAUGHLIN ET AL., APPELLANTS.

·21 N. W. 2d 868

FILED FEBRUARY 21, 1946. No. 31973.

*Sterling F. Mutz,* for appellants.

*A. L. Tidd, Perry, Van Pelt & Marti,* and *Walter H. Smith,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

The issues in this action arose out of a suit in equity to partition 240 acres of farm land in Cass County. Plaintiff therein claimed to own an undivided two-fifths interest in the land. Three brothers of plaintiff and the respective wives of two of them were made defendants. It is conceded that the brothers each owned an undivided one-fifth interest. A sister, who was not made a party defendant, intervened alleging that she was the owner of an undivided one-fifth interest claimed by plaintiff. The trial court found generally for plaintiff and against intervener who, after her motion for new trial was overruled, appealed to this court.

Her assignments of error are substantially: (1) That the trial court erred in holding that a deed made, executed, and delivered to plaintiff by a trustee in bankruptcy on October 14, 1940, conveyed an absolute fee simple title of an undivided two-fifteenths interest to plaintiff; (2) that the trial court erred in holding that a quitclaim deed made, executed,

and delivered to plaintiff by intervener and her husband on September 27, 1940, conveyed an absolute fee simple title to an undivided one-fifteenth interest to plaintiff; and (3) that the trial court erred in its refusal to grant a new trial upon the ground of newly discovered evidence concerning the value of the one-fifth interest involved. We sustain intervener's second contention for the reason that under the circumstances plaintiff holds a one-fifteenth interest for the benefit of intervener under a constructive trust. We find, however, that intervener's first and third assignments are without merit.

For convenience and clarity, we will first discuss the third assignment. There was no contest between the parties upon the question of the right to partition the land and, after entry of the decree here involved, the trial court ordered it sold. In conformity therewith it was sold on March 17, 1945, for a price netting each one-fifth interest approximately $8,000. Upon the basis of that surprising result intervener now claims the right to a new trial because of newly discovered evidence of value. The transaction involved occurred in 1940. At the trial the parties each introduced evidence of value in 1940, showing that the one-fifth interest was then worth from $2,700 to $4,800. Without discussing the proposition at length, we conclude that the third assignment is without merit because intervener failed to make a sufficient showing of reasonable diligence and the proposed evidence, whether material or not, would be merely cumulative without changing the result in any event. Smith v. Goodman, 100 Neb. 284, 159 N. W. 418.

We turn then to the principal questions presented by the first two assignments. Decision involves primarily a determination of facts and the application of well-established rules of law. There is not much dispute in the evidence as it affects the material issues. We are concerned primarily then with the application of principles of equity to undisputed facts.

Substantially the evidence is as follows: Upon the death of their father, November 4, 1925, each of five brothers and

sisters inherited an undivided two-fifteenths interest in the old family home farm. Thereafter, upon the death of their mother, July 14, 1940, each inherited the remaining undivided one-fifteenth interest. There are two sets of improvements on the land. For many years plaintiff, single, together with her mother and a single brother, lived on the improved 160 acres and a married son lived as a tenant on the improved 80 acres. After the mother's death they continued to so occupy the property except that plaintiff lived with the single brother who was thereafter a tenant on the improved 160 acres. The intervener and her husband were tenants on a farm not far distant.

During their lifetime and until early in·1941, when the present controversy culminated, plaintiff and intervener, sisters, had a friendly and confidential relationship. Extending over a period of years plaintiff had loaned intervener money with which to surmount financial difficulties without either of them keeping close account of the amounts or disputing them.

In the early summer of 1939, intervener was having financial difficulties and became involved in litigation with creditors. On June 7, 1939, she made, executed, and delivered to plaintiff a real-estate mortgage upon her two-fifteenths interest to secure the payment of a preexisting debt for loans of money represented by two antecedently executed promissory notes in the total amount of $1,550. One note was for $700 at 5 percent, dated May 12, 1937, due in one year, upon which was endorsed: "Insterest Paid by cash 35 00 May 1-1939." The other was for $850 at 6 percent, dated May 1, 1939, due in five years. It was given as renewal of a note for like amount, dated June 8, 1934, due in one year, upon which was endorsed: "Insterest Paid by cash $51 00 May 1st. 1939." Intervener's husband did not join in the execution of the mortgage but it was duly filed of record June 8, 1939.

There appears in the evidence a release of that mortgage purportedly executed by plaintiff on June 17, 1939. Intervener testifies that it was executed and delivered to her by

plaintiff. However, it was never filed of record and without dispute the notes and mortgage were at all times retained by plaintiff. Concededly the debt represented thereby was not paid by intervener and we are unable to find in the record any plausible or satisfactory reason for the execution of the release. Be that as it may, we conclude that subsequent events set in motion by acts of intervener herself make it unnecessary to decide that question.

We have reference to the fact that on August 10, 1939, intervener filed voluntary proceedings in bankruptcy and was accordingly adjudged a bankrupt. Her entire assets at that time consisted of the undivided two-fifteenths interest inherited from her father. Her sworn schedule of unsecured indebtedness included $538 for rent and medical services and an unpaid judgment, dated June 12, 1939, for $1,354.34, together with $60 court costs.

Her sworn schedule of secured indebtedness included her debt to plaintiff in the amount of $1,550, represented by the two notes secured by the mortgage upon her undivided two-fifteenths interest. On September 6, 1939, plaintiff filed her claim thereon in the bankruptcy court to which the trustee, who was also counsel for the judgment creditor, filed objections, substantially denying validity of both the debt and the mortgage. It is conceded that the attorney who represented intervener in the bankruptcy proceedings also, without objection, represented plaintiff in filing her claim and thereafter until such proceedings were concluded.

In 1940, their attorney and plaintiff entered into negotiations with the trustee for a settlement with all the creditors and as a result the trustee offered to accept $1,200 upon condition that plaintiff withdraw her claim. This offer was communicated to the parties. Intervener being bankrupt and without funds was unable to make the payment or borrow any money for that purpose. Naturally the sisters conferred with each other and with their attorney concerning the situation, after which plaintiff made application to her banker for a loan of $1,200 with which to buy intervener's two-fifteenths interest from the trustee, obtain the

title thereto, and close the bankruptcy proceedings. It will be observed that only the two-fifteenths interest was ever involved in the bankruptcy but in the meantime intervener had inherited the other one-fifteenth interest. The title to the one-fifteenth interest never vested in the trustee because it was inherited by intervener more than six months after bankruptcy. See 4 Collier on Bankruptcy (14th ed.), sec. 70, p. 911.

The banker informed plaintiff in effect that he would lend her that amount of money only upon the entire two-fifths interest as security. He suggested that plaintiff acquire a quitclaim deed from intervener for that purpose and insisted that before he would make the loan, title to the entire two-fifths interest must be placed in plaintiff, clear of encumbrances.

Plaintiff so informed intervener and asked if she would give a quitclaim deed for that purpose. Intervener and plaintiff both consulted with their attorney who understood that the quitclaim deed was to be used only for temporary purposes and he advised intervener to execute the instrument. Thereafter, reposing confidence in plaintiff, she consented to do so. There is no competent evidence that intervener intended thereby to make a gift to plaintiff of her one-fifteenth interest. On the other hand there is no direct evidence of an express promise by plaintiff to hold it in trust for intervener or reconvey it to her after the $1,200 obligation was paid. Nevertheless, the parties were in a confidential relation involving a matter of common property. A two-fifteenths interest in the old farm home, upon which plaintiff then lived, was about to be sold for the benefit of creditors in the bankruptcy proceedings. Without doubt all of the parties understood clearly that the quitclaim deed was executed solely for the purpose of assisting plaintiff in obtaining a loan with which to save the two-fifteenths interest for herself, thereby satisfying her hazardous claim, as a preferred creditor of intervener, and preventing strangers to the family from obtaining an interest in the family property.

Plaintiff argues that at the time the quitclaim deed was executed intervener indicated she would rather have plaintiff get the property than her creditors. It would only be natural for intervener to make such a statement. However, we must remember in appraising it that only her two-fifteenths interest was ever involved in the bankruptcy proceedings as distinguished from the one-fifteenth interest thereafter acquired which her creditors could not take in any event. If the statement was made, we are convinced that intervener had reference solely to her two-fifteenths interest which was then at the disposal of her creditors all of which plaintiff subsequently acquired.

By prearrangement plaintiff, the intervener and her husband met in Plattsmouth on September 27, 1940, where plaintiff executed a release of the $1,550 mortgage. The release was duly filed of record December 21, 1940, but not until after the Nebraska State Bank, Weeping Water, Nebraska, had made the loan of $1,200 to plaintiff and the bankruptcy proceedings had been closed. On September 27, 1940, the intervener and her husband executed and delivered to plaintiff a quitclaim deed to all intervener's interest in the property. It is conceded that no consideration was given for the one-fifteenth interest included therein. It should be stated also that the quitclaim deed was never filed of record and, strange as it may seem, although admittedly executed and delivered to plaintiff and later given by her to the bank making the loan, it is now lost. There is no evidence pretending to quote any of its provisions but intervener says it was claimed and given as a mortgage to get the money. On September 27, 1940, plaintiff executed and delivered to the Nebraska State Bank at Weeping Water, her promissory note for $1,200, at 7 percent, due in one year, secured by a real-estate mortgage upon all the two-fifths interest and thereby obtained the loan. However, that mortgage was never filed of record.

On October 2, 1940, the trustee in bankruptcy gave plaintiff a receipt for $1,200 as purchase price of the two-fifteenths interest involved in the bankruptcy proceedings,

subject to the withdrawal of plaintiff's $1,550 secured claim and subsequent confirmation by the court. On that date the trustee filed application for authority to sell intervener's two-fifteenths interest to plaintiff upon those terms and plaintiff filed a withdrawal and release of her claim. On the same date the referee in bankruptcy mailed notices of the proposed sale and its terms to all creditors. No objections were filed and on October 14, 1940, the court entered an order authorizing and confirming the sale to plaintiff as proposed, subject to taxes, liens and encumbrances. On the same date the trustee executed and delivered his deed to plaintiff as authorized which was duly filed of record October 18, 1940. Thereafter, on October 30, 1940, an order was entered by the bankruptcy court allowing the trustee's final report, declaring first and final dividend to creditors, discharging the trustee, and closing the proceedings.

Thereafter, on November 1, 1940, plaintiff, in lieu of the note and mortgage dated September 27, 1940, made, executed, and delivered to the bank a new note for $1,200 at 7 percent, due September 27, 1942, and a new real-estate mortgage upon an undivided two-fifths interest in the property involved which was duly filed of record December 21, 1940.

On January 2, 1941, all five of the children met in the office of an attorney in Plattsmouth. There they jointly and severally made, signed, executed, and delivered two annual crop-sharing farm leases upon the property to the two brothers. There was no claim or suggestion by anyone at that time that intervener did not have an interest in the property.

It appears from the record that plaintiff paid all the interest and principal of the $1,200 note except the sum of $100 which was paid by intervener on April 14, 1941, out of her share of the personal property received from her mother's estate. Plaintiff admits such payment but contends that it represented attorney's fees and costs advanced by her to intervener in the bankruptcy proceedings. The trial court so found and we sustain that contention.

At the time this payment was made at the bank, however, intervener, in the presence of the banker, asked plaintiff to enter into a written contract of some sort demonstrating their true relationship with reference to the property. This the plaintiff refused to do and the confidential and friendly association between them became strained and subsequently severed. Shortly thereafter intervener offered to pay plaintiff the balance of the $1,200 note, claiming thereby to be entitled to all the one-fifth interest which plaintiff refused to concede or accept.

In the fall of 1941, plaintiff informed intervener's attorney that she would sell all of the one-fifth interest back to intervener for $3,000 but the offer was not given serious consideration.

Plaintiff has received all the rentals from the two-fifths interest less that proportionate share of taxes paid for the years 1941, 1942, and 1943. The net rentals for 1944 at the time of trial had not yet been divided and the amount thereof does not appear in the record. On June 3, 1943, the $1,200 note having been paid in full by plaintiff the mortgage given to secure its payment was released by the bank.

In the meantime during 1941 intervener having employed counsel was attempting to force a settlement of the controversy and on December 20, 1941, the partition action was filed by plaintiff. Intervener thereafter on January 17, 1942, filed her petition in intervention but the issues were not tried on the merits until January 3 and 5, 1945. The decree awarding judgment thereon was entered February 1, 1945.

Under the circumstances above recited we conclude that title to intervener's two-fifteenths undivided interest, involved in the bankruptcy proceedings, became vested in plaintiff absolutely by virtue of the deed from the trustee in bankruptcy and to that extent the decree of the trial court was correct. However, by reason of a constructive trust we must arrive at a different conclusion with regard to intervener's one-fifteenth undivided interest in the property which was not involved in the bankruptcy proceedings.

In that connection it is well established that: "A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." Restatement of the Law, Trusts, ch. 1, s. 1, comment e, p. 5. See, also, Restatement of the Law, Restitution, ch. 9, s. 160, p. 640; 65 C. J., Trusts, s. 215, p. 454; Nelson v. Seevers, 143 Neb. 522, 10 N. W. 2d 349; O'Shea v. O'Shea, 143 Neb. 843, 11 N. W. 2d 540.

In Pollard v. McKenney, 69 Neb. 742, affirmed on rehearing at p. 753, 96 N. W. 679, 101 N. W. 9, this court said in part: "Thus if one person procures the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds toward the owner of the legal title, obtains such title from him upon more advantageous terms than he could otherwise have obtained it, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. Again, if a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits; out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title." That statement was approved by this court as recently as O'Shea v. O'Shea, *supra*.

In Restatement of the Law, Restitution, s. 182, p. 730, it is said: "Where the owner of an interest in land transfers it inter vivos to another upon an oral trust in favor of the transferor or upon an oral agreement to reconvey the land to the transferor, and the trust or agreement is unenforceable because of the Statute of Frauds, and the transferee refuses to perform the trust or agreement, he holds the interest upon a constructive trust for the transferor, if * * *

(b) the transferee at the time of the transfer was in a confidential relation to the transferor, * * * ." See, also, Restatement of the Law, Trusts, s. 44, p. 135.

Lest it be argued therefrom that intervener cannot prevail because there is no direct evidence of an express promise or agreement by plaintiff to reconvey or hold the one-fifteenth interest in trust for intervener, we call attention to Wiseman v. Guernsey, 107 Neb. 647, 187 N. W. 55, wherein it was held: "Where a trust ex maleficio is based on a promise, the promise need not be expressly made, for actual cooperation or silent acquiescence may have the same effect."

In Restatement of the Law, Restitution, s. 160, comment a, p. 641, it is said: "On the other hand, a quasi-contractual obligation and a constructive trust closely resemble each other, the chief difference being that the plaintiff in bringing an action to enforce a quasi-contractual obligation seeks to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money, whereas the plaintiff in bringing a suit to enforce a constructive trust seeks to recover specific property."

Referring to a constructive trust arising out of an oral promise to hold land in trust, or for a specified purpose, or to reconvey, it is stated in 65 C. J., Trusts, s. 223, p. 471: "Such a trust will arise, however, out of such a promise made in connection with the receipt of the legal title to property, provided the grantor's purpose is an honest one, * * * where confidential relations exist between the parties and there is no other consideration for the conveyance except the promise, or where the promise is the inducing cause of the conveyance, no other consideration being given, and is relied upon by the grantor, or where the conveyance is made as security for a debt and the value of the land exceeds the amount of the debt. The promise need not be express in order to raise a trust, silent acquiescence on the part of the grantee being sufficient where he has knowledge of the grantor's intention and understanding of the transaction." See, also, 65 C. J., Trusts, s. 215, p. 456.

As stated in 54 Am. Jur., Trusts, s. 225, p. 173: "While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one. The origin of the confidence reposed is immaterial. A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship."

We must conclude, as equity and justice require, that plaintiff at all times here involved held and now holds title to an undivided one-fifteenth interest in the property as a constructive trustee for intervener and the title thereto should be quieted in intervener without any liability to plaintiff upon the $1,200 note and mortgage paid by plaintiff. It follows as a matter of course that intervener is entitled to a one-fifteenth interest in the proceeds which resulted from the sale of the property by partition, plus her one-fifteenth share of the net rentals, being one-sixth of the amount actually received by plaintiff, from the property for each and all of the years, 1941, 1942, 1943, and 1944 with interest at 4 percent respectively from the dates of the receipt thereof.

For the reasons heretofore stated the cause is reversed and remanded with directions that the trial court take an accounting as to rents between plaintiff and intervener, upon the basis above set forth, and enter a judgment in favor of intervener and against plaintiff for such sum as thereafter may be found due her, all of which shall be due

and payable out of the plaintiff's share of the proceeds resulting from the partition sale. Further the trial court shall also enter an order awarding and distributing to intervener her one-fifteenth interest in the proceeds resulting from the partition sale. The costs of the proceedings in intervention and appeal therefrom are taxed equally between plaintiff and intervener. Other legal propositions are ably presented by counsel for the parties but upon our view of the case we find it unnecessary to discuss them.

REVERSED AND REMANDED WITH DIRECTIONS.

CARTER, J., dissenting.

Plaintiff and intervener were sisters. Intervener became financially involved. On August 10, 1939, she was adjudged a bankrupt. Among the assets listed in the bankruptcy proceedings was a two-fifteenths interest in the real estate involved in this suit. Plaintiff filed a secured claim in the form of a mortgage in the amount of $1,550 against the aforesaid two-fifteenths interest. Plaintiff admits that no consideration passed on the date the notes were given. She admitted she had no checks or other records showing that any indebtedness existed. She merely states that her sister had borrowed money from her at various times. Intervener for obvious reasons made no attempt to deny the validity of the notes. While the transaction has every appearance of having been carried out for the purpose of delaying and defrauding creditors, there is no issue tendered on this subject. It may be considered, therefore, as a circumstance only bearing upon the nature of the transaction.

The mortgage in question was executed on June 7, 1939, and recorded on June 8, 1939. The record shows that an action was pending in the district court for Cass County against the intervener when this mortgage was executed upon which a judgment for $1,354.34 was entered on June 12, 1939. On June 17, 1939, plaintiff executed a satisfaction of the mortgage dated June 7, 1939, in which it was stated that said mortgage was "fully paid, satisfied and discharged." In questioning plaintiff concerning this satisfaction of mortgage she made the following inconsistent

and incredible replies: "Q. Showing the witness Exhibit 11, a purported release of mortgage, I will ask you if you have ever seen that before? A. I don't ever remember of seeing it. Q. Was there ever anything said to you about releasing this mortgage, Exhibit 6, being the mortgage with the notes? A. No. Q. Do you recall Jack Hayward going over to Attorney Kile's office with you? A. I don't remember of it. Q. Do you recall at Kile's office, being told that there was a notary over in the Land Bank? A. I don't remember of it. Q. Do you recall Miss Dougan? Do you recall meeting her? A. No, I can't ever remember of meeting her. * * * Q. Now, I hand you Exhibit No. 11 and will ask you if that is your signature in the middle of the page? A. It looks like it. Q. Is that all the answer you care to give? A. That is all you asked me. * * * Q. Isn't this Exhibit 11 the one that was wiping out that prior transaction because it didn't go through? A. No, Sir. Q. What were you doing? A. That is what I would like to know. Q. You don't even know how you happened to give a release? A. I don't." I submit that the foregoing evidence shows beyond the peradventure of doubt that the mortgage was given to delay and defraud the creditor about to obtain a judgment in Cass County, and, after it failed to deter the entry of judgment, plaintiff executed a satisfaction of the mortgage. The satisfaction of mortgage not having been recorded, plaintiff filed the mortgage and notes in the bankruptcy proceeding as a secured claim for the evident purpose of aiding the intervener as against her creditors. The attorney for the intervener confirms the statement that the mortgage was not given in good faith when he testifies that it was included in the list of assets and liabilities filed in the bankruptcy estate by mistake. It is noteworthy that the trustee in bankruptcy filed objections to the allowance of the mortgage as a valid claim and that plaintiff, when summoned to testify by deposition concerning its validity, refused to appear and so do.

At this stage of the proceedings intervener's attorney negotiated a compromise settlement with the trustee in bankruptcy whereby the trustee would sell intervener's in-

terest for $1,200, provided the withdrawal of the mortgage filed as a secured claim could be secured. Here again it was evident that plaintiff preferred to settle the controversy with the trustee rather than testify concerning the validity of the mortgage and the purpose for which it was given. In any event, the attorney advised intervener of the offer and she immediately contacted the plaintiff with reference to it. Plaintiff went to her banker, who agreed to loan the $1,200 if the title could be cleared to intervener's interest in the property by a quitclaim deed from intervener to plaintiff. The deed was executed, delivered to the banker, never recorded and is alleged to be lost. On the same day the quitclaim deed was executed, a second release of the mortgage dated June 7, 1939, was executed and recorded on December 21, 1940. On September 27, 1940, plaintiff executed a note and mortgage for $1,200 to the bank, secured by the two-fifths interest. This mortgage was never recorded. Plaintiff took the $1,200 and paid it to the trustee in bankruptcy, who in turn executed and delivered a trustee's deed to plaintiff. On November 1, 1940, a new note and mortgage for $1,200 was executed and delivered to the bank and recorded on December 21, 1940. It is clearly apparent that the quitclaim deed and the mortgage of September 27, 1940, were temporary expedients and never treated as having any permanent effect. The mortgage of November 1, 1940, covering a two-fifths interest in the real estate necessarily covered the two-fifteenths interest the intervener acquired by inheritance from her father and the one-fifteenth interest she subsequently acquired upon the death of her mother after she had received her discharge in bankruptcy. The trustee's deed covered "All of Stella Mae McLaughlin's undivided interest" in the property involved. It is evident, therefore, that plaintiff claims the one-fifteenth interest which plaintiff acquired subsequent to the bankruptcy proceeding. While the additional one-fifteenth interest may have been inadvertently included in the mortgage, it is evident that plaintiff claims it as her own and thereby indicates an intent to get all she can from her helpless sister.

There is further evidence in the record that plaintiff took the title in her own name for the purpose of negotiating a loan to protect her sister's interest. On January 2, 1941, the property in question was leased to a brother of these two sisters. Intervener was named as one entitled to receive a share of the rents. She signed the leases along with the others having an interest in the property. If plaintiff was, as she now claims, the owner of intervener's one-fifth interest, why was intervener requested or permitted to sign the leases as one of the lessors? The answer is self-evident and in line with the intent and purpose of the parties at that time—that plaintiff was holding the title for intervener for the sole purpose of obtaining the $1,200 which the banker was willing to make to her if she held the title but which he was unwilling to make to the intervener because of her financial circumstances.

The record shows that when the mother's estate was probated the intervener received $105.35 as her share of the personal estate. She went to the bank and applied $100 on the $1,200 note. No protest appears in the record on the part of the plaintiff. She now attempts to avoid the unfavorable inference growing out of this act by asserting that it was a repayment of attorney's fees, costs, and expenses. The difficulty with this statement is that there were no attorney's fees, costs, or expenses included in the $1,200 note, as both parties well knew. The money was paid in at the bank by the intervener for credit on the note given to obtain the money for the redemption of intervener's property from the trustee in bankruptcy. In this, plaintiff acquiesced until the necessity for a more favorable explanation became pressing. In any event, plaintiff's evidence is self-discrediting for another reason. She claims the $100 payment includes mileage, recording costs, and the expense of drawing papers. If plaintiff's story is true, these are expenses she should have paid herself. The fact that she charges them to intervener indicates the intervener and not the plaintiff was the real purchaser of the interest of the trustee in bankruptcy.

Nowhere in this record does plaintiff claim that she owned this property from the date she received this trustee's deed. Intervener testifies that she talked with plaintiff about reconveying the title and that plaintiff made no claim of title in herself. The record shows that the two sisters went to the bank for the evident purpose of making out a contract showing the true relations of the parties. There the plaintiff changed her mind and said: "I have signed all the papers I am going to sign." That the foregoing statement is true is borne out by other testimony in the record on the part of the plaintiff herself. On cross-examination plaintiff gave the following evidence: "Q. When she came to the house, will you, as nearly as you can reconstruct, tell the Court what she said to you with reference to paying off the indebtedness? A. She came and wanted to buy her share back. Q. What did she say about that? A. She said she could borrow the money to buy her share back and I wanted to know where she could get her money from and she said she wouldn't tell me, that was all right. Q. What did you say? A. I wanted to know who was going to be in partnership with me." At this stage of the proceedings plaintiff was not asserting title in herself but was putting off the intervener on the theory that she did not have to convey the property on repayment of the money due her if it might result in a partner of whom she disapproved. On cross-examination the plaintiff also testified to the following: "Q. After you said you would not do so, or did you tell her you wouldn't do that at all? A. Do what? Q. Redeed the property back to her if she paid the money you advanced? A. I just didn't tell her right out that I would or wouldn't, as I remember." I submit that this is not the testimony of an owner claiming title from the time she obtained the deed. She further testified on cross-examination: "Q. At that time did you hear Mrs. McLaughlin say to you as a sister, 'I want you to be reimbursed for every item of money that you have spent, including 7% interest on the amount I borrowed,' didn't she tell you that? * * * A. She might have. Q. What was said in response to that? A. I probably said—

I just don't remember the exact words of what I did say." I submit, also, that this is the faltering testimony of one who was not then claiming title in herself but who has now changed position in that respect.

To me, this is a clear case of fraud, amply demonstrated from the record. The intervener, because of financial difficulties, went to her sister for aid. The plaintiff was then willing to help her save the inheritance she obtained from her father. After intervener trusted the plaintiff to the extent of conveying title to her for the purpose of raising the money necessary to save it, the plaintiff, seeing an opportunity to take advantage of the position of her sister, seized upon it as a means of acquiring a large profit at the expense of her sister. At the time of the origin of the transaction, the intervener's interest in the property was worth from $2,700 to $4,800. It actually sold for $8,249 at partition sale. Under the majority opinion the plaintiff obtains two-thirds of this interest for $1,200 and the release of a mortgage for $1,550, which had already been solemnly "paid, satisfied and discharged" by an instrument acknowledged to be such before a notary public. The record shows also that the $1,200 was largely paid off by rentals obtained from the property. The transaction reeks with fraud and imposes a duty upon a court of equity to assert its powers in compelling the plaintiff to remain faithful to her trust by reconveying the property and accounting for the rents. The intervener should likewise be required, as she offers to do, to repay all moneys owing to the plaintiff with interest. Such is my conception of equity when one attempts to disavow a trust relation in response to a selfish urge by mulcting the beneficiary who had reposed confidence in the honesty and integrity of the trustee. I submit that the opinion of the majority has the effect of condoning a grievous fraud when its duty requires that it protect a person who finds himself in a precarious position because he trusted one whom subsequent events demonstrate he should not have trusted.

SIMMONS, C. J., concurs in this dissent.