MINNIE NELSON ET AL., APPELLEES, v. CHRIS RASMUSSEN ET AL., APPELLANTS, IMPLEADED WITH MARTHA RASMUSSEN ET AL., APPELLEES.

82 N. W. 2d 418

Filed April 12, 1957. No. 34154.

P. F. *Verzani* and *Mark J. Ryan*, for appellants.

*Warner & Shokes* and *Free & Free*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Appellees seek a determination in this cause that a designated bank deposit and described United States savings bonds were the property of Martha Rasmussen at the time of her death and that Chris Rasmussen be required to account for the deposit and the bonds or the proceeds of and income from them to the representative of the estate of Martha Rasmussen. The judgment of the district court was favorable to appellees. It is presented to this court for review by an appeal.

Chris M. Rasmussen, a resident of Dakota County and the owner of the real estate described in the petition in this case, died intestate December 9, 1939. He was

survived by Martha Rasmussen, his widow; Hans Rasmussen, Axel Rasmussen, Rasmus Rasmussen, Walter Rasmussen, and Chris Rasmussen, his sons; and Minnie Nelson, Elizabeth Hansen, Sena Jensen, and Ella Jepsen, his daughters. Ordinary administration of the estate of the deceased was not had but a limited and circumscribed administration thereof was commenced in the county court of that county more than 2 years after the death of the deceased and it was prosecuted to a conclusion as authorized by the statutes of this state. §§ 30-1701 to 30-1704, R. R. S. 1943. The court on March 25, 1950, found therein the facts required as a prerequisite of the validity of such a proceeding; that deceased was the owner of the real estate referred to above; that the widow, the sons, and the daughters of the deceased were his heirs; and that the real estate descended to the widow one-third thereof and to each of the children two twenty-sevenths thereof.

Hans Rasmussen, a resident of Harris County, Texas, died April 16, 1947, survived by Martha Rasmussen, his widow; Russell Rasmussen, his son; and Robinette Qualls, his daughter. It was found and adjudged by the county court of Dakota County on March 25, 1950, in proceedings duly brought and prosecuted therein, as provided by law, that the widow and children of the deceased were his heirs and that the interest of the deceased in the real estate descended to them an undivided one-third thereof to each. The decrees of March 25, 1950, in the matter of the estate of Chris M. Rasmussen, deceased, and in the matter of the estate of Hans Rasmussen, deceased, each became final as rendered.

Martha Rasmussen, the widow of Chris M. Rasmussen, died intestate May 2, 1952, a resident of Dakota County. She was the mother of the children of Chris M. Rasmussen. They survived her except Hans Rasmussen. His widow and children survived his mother. Mark J. Ryan was appointed, qualified as, and is administrator of the estate of Martha Rasmussen, deceased, by pro-

ceedings duly instituted and now pending in the county court of Dakota County.

The real estate in South Sioux City was the homestead of Chris M. Rasmussen and his wife, Martha Rasmussen, from 1938 until the death of the former. The widow occupied and used it as her home until her death. She leased and collected the rents from, paid the taxes on, and the maintenance expenses of, the three farms owned by her husband when he died from the time of his death until her death. The term deceased will be used to designate Martha Rasmussen, widow of Chris M. Rasmussen, except when she is described as mother or by her name. The term appellant or Chris will be employed to identify Chris Rasmussen, the youngest son of the deceased, sometimes named as Chris M. Rasmussen, and who is one of the appellants.

The real estate owned by Chris M. Rasmussen at the time of his death, except that in South Sioux City, was sold and conveyed by his heirs, except Hans Rasmussen, and by the heirs of Hans Rasmussen, deceased. The respective spouses of the grantors who were married joined in the deeds. Walter Rasmussen was the purchaser of 160 acres of the land; Jorgen F. Nelson, husband of Minnie Nelson, bought 80 acres of the land; and Rasmus Rasmussen became the owner of the remaining 160 acres of the land. The net proceeds of the sale of the land were paid to, received, and have since been retained by the owners of it in the proportion of the ownership of each. The possession of the land was surrendered to the purchasers when the sale thereof was completed.

The net share of the deceased was $17,697.59. A deposit of $5,600 was made in her account subject to check in the Nebraska State Bank of South Sioux City which account she had maintained therein since April 4, 1944. On or about May 23, 1950, $12,000 was invested by Martha Rasmussen in United States savings bonds, series G, and they were registered in the name of and

made payable to Martha Rasmussen or Chris Rasmussen.

Chris M. Rasmussen, his wife, and appellant lived on a part of the land the father owned until the year 1938. They moved to South Sioux City at that time and lived there until the death of the father in the year 1939. Thereafter Chris and his mother occupied the family home until the death of the mother in 1952. Martha Rasmussen, the deceased, rented the land her husband owned when he died. The rental for two of the farms was cash and the rental of the other was a share of the crops raised thereon. The rentals were received or collected by the deceased until the time of her death. She paid the taxes on the real estate. Matters concerning the home were conducted by the deceased and her son Chris until her health became impaired. Thereafter her daughters and daughters-in-law were in the home frequently and assisted in the care of the deceased and the home on week days and Chris did this at night and on Sunday. He was unmarried and lived at home as he had always done. He was 49 years of age in 1956. A sister of Chris who lived near the home of her mother testified she had always visited her mother quite often—about once or twice a week. She testified that she had no personal knowledge that Chris transacted any business for her mother. She did say that when her mother was sick Chris got groceries and if there were taxes that had to be paid he paid them. Another sister testified that her mother talked about business with and sought advice from Chris with respect to business affairs. She gave no facts to support this conclusion except she said if her mother had money to deposit sometimes Chris did it and sometimes her mother did it herself, and that when her mother was sick Chris wrote checks on her account. She did not say what the checks were for or to whom they were payable. Appellant said that the only checks he wrote on his mother's account were for groceries and in this respect he was without direct challenge. He did make

deposits in the account of his mother in the bank when she was not going to the bank and he was. There was testimony to the effect that a person had seen the deceased in the bank on a few occasions after about January 1, 1949, but he could not specify when. His recollection was that Chris was with his mother at these times.

The deceased, a native of Denmark, came to the United States when she was about 23 years of age. She did not attend school in the United States. Her use of the English language was limited to usual matters experienced by persons of like situation. She did not understand uncommon, difficult, or unusual words expressed in English. She read and understood the county paper and a daily paper published in English. She generally had read the paper before Chris came home from his work and she would tell him when he arrived home of things she had read. She often discussed news items and events which she had read in the papers. She did this until near the end of her life. The deceased was not as robust physically commencing about 1938 as she had been previously. Her hearing and eyesight were impaired to some extent. She required glasses for reading purposes and she had a hearing aid. In order for her to hear during a conversation it was necessary that the speaker talk somewhat louder than was required in earlier times. It was thought that probably her eyes were affected by cataracts.

In July 1949 she had a heart attack. Chris came home at noon from his farm work and found her ill, lying on the davenport in the home. He summoned a doctor. The doctor attended her for a considerable time thereafter. The sisters and sisters-in-law of Chris came to the home and different ones of them stayed at different times with and assisted the deceased during the day while Chris was away at his work. They did this during work days and Chris took care of his mother and the home at night and on Sunday. The deceased spent

more than half of the time in bed for a considerable time after the heart attack. She was up and down at irregular intervals. She gave evidence after the heart attack of being more easily disturbed and she cried at times when the cause of it was not easily discernible. She did not recover her previous normal physical health but it was not much different than it had been for a year or so previous to her illness. There is testimony that she would be in bed one day and up the next and out in the garden with her flowers. She did things about the house. There were times when she was left alone in the home entirely unattended. She went downtown and to the bank a few times by herself after her illness in 1949. Generally she was accompanied by someone and usually Chris took her.

The husband of the deceased generally attended to business matters until his death and thereafter she usually transacted the business matters in which she was interested until the time of her death. The proof is that until her last illness she recognized persons she had known when she came in contact with them, including members of her family; that she was aware of what property she had; that she knew the facts of her bank account; that she realized what she wanted to do or have done with her property; and that she knew the meaning and effect of what she did, with the possible exception that in 1949 during her illness when she thought her dissolution might be near she exhibited unnecessary and unwarranted anxiety concerning the existence of sufficient funds to pay expenses that would accrue incident to her transition from life to death. There is no evidence that she had any mental deficiency. In this respect she was as mentally sound, alert, and keen of comprehension as would be expected of a normal person her age. She had passed her 83rd year of life at the time of her death.

The deceased was a patron of the Nebraska State Bank of South Sioux City commencing with April 4,

1944, and continuously until the time of her death. The signature card originally furnished by her to the bank incident to her account, identifying the persons authorized to sign checks on it, was signed on the face or front side of the card by Martha Rassmussen and Chris M. Rasmussen. It was shown that the name Chris Rasmussen and Chris M. Rasmussen in this respect related to and identified the same person. At a later date, not established by the record of the bank or known to its officer who testified but probably after September 1946, the joint account agreement printed on the back of the signature card was signed by Martha Rasmussen and Chris Rasmussen using the name of Chris M. Rasmussen.

A daughter of the deceased, one of the appellees, testified that in July 1949, after the deceased had difficulty with her heart, when she was very sick and thought she was going to die, she asked appellant to go to the bank and draw all her money out of it so that there would be money to bury her. He told his mother that he did not want her money but about 11 a. m. of that day he left the house and later returned to the home with two signature cards. He had one "making himself a survivor on her account." He had another and he told his mother "if she would sign them then she could get his money if he died first." She signed the card with respect to her account and the other card he had brought with him when he returned. Appellant returned the card concerning her account to the bank. The witness said the doctor called on her mother that morning and he administered medication to her by hypo before the conversation about the bank account. She said such treatment caused her mother to lose awareness of her environment and usually she went to sleep after she submitted to a hypo. How long it was before the conversation that the hypo was administered or what was administered to the patient does not appear. The deceased said nothing to her daughter then or

later about her bank account. Likewise the daughter had no part in the conversation and made no protest or objection to what was done. She did not say that her mother did not appear and act rational or that she did not act with full knowledge and understanding of what she did. The witness does not claim that she made any effort to find out from her mother then or later if she was aware of what she had done and if her act in that regard and the effect of it was what she desired, notwithstanding the fact that the witness said she spent about one-third of her time with her mother from then until her death and her mother lived for about 3 years afterward. The witness did testify that she did not mean to be understood that she thought at that time that her brother Chris was trying to take advantage of her mother.

Appellant, when he was asked if he remembered when he took the signature card in reference to the account of his mother from the bank to his home so that she could sign it, answered that he did, vaguely. She was quite sick and she became anxious about the signature card she had given the bank as one of its customers. The bank had changed hands some time before. She worried about whether there would be money available to bury her. She did not ask him to withdraw her money from the bank for this purpose. She asked appellant to go to the bank and get a signature card "or to see if it was still available at the bank that way." He went to the bank and talked to the cashier about the signature card, and the cashier said there was a card there but "to make sure you just sign another one here and take down there and have her sign it." Appellant got the signature card from the bank and took it home. The joint agreement on the card was signed by his mother and by him and he took it back to the bank where it remained, was recognized and acted upon, and was in the bank at the time of the death of deceased. His mother was sick at the time but there was nothing that he heard or saw which indi-

cated she thought she was going to die. She did not say for him to get the money from the bank so there would be money to bury her. He did not testify that it was not said at the time the card was signed in the home that if his mother and appellant signed the joint agreement on the card, the latter could withdraw the money. He testified that he did not suggest that his mother sign the joint agreement; that he did not induce her to do so; and that he never attempted to nor did he ever at any time persuade or influence his mother in any manner or by any means in regard to any business matter or act.

The sister of appellant, who was a witness as above related, testified that when she and appellant were alone in her home on the Gladys George place east of South Sioux City he told her that he had tried to get his mother to make a will but she refused and he said "I can't go any further now." He stated that dad said he could have the house and mother should give it to him. He also said, concerning what he felt he should have from the property of his mother, that one lady gave the house to a son who stayed with her and he thought mother should do the same with him because he had all the work to do. The time of these statements ascribed to appellant is not stated with definiteness but it is indicated that it was probably in June 1950. Appellant denied having made the statements attributed to him by his sister and he said that he never talked with her about his mother making a will. He had no knowledge that she made any attempt to give him the house. She had an interest in the house but she did not own it and any talk about her giving it to him was not only futile but improbable.

The hypothesis of appellees that appellant and his brother, Axel Rasmussen, entered into a conspiracy to induce their mother to consent to and join in a sale of the farm land to get the property in a more accessible form since appellant had been named a joint owner

with his mother of her bank account proceeds from and pursues a false and nonexistent basis. Appellees argue that Chris M. Rasmussen, husband of Martha Rasmussen, made a will devising his wife a life estate in his real estate and devising the remainder to his children equally. They say the evidence of this is uncontradicted. Their petition in this case alleges that none of the appellees ever saw an instrument purporting to be the will of their father. They offered no proof of the contents of such an instrument. A deposition offered to show that the witness and another saw Chris M. Rasmussen sign a paper which he stated was his will and that his signature was attested by the witness and another as subscribing witnesses was excluded upon objection at the trial. There was no offer made that either of the persons knew what the instrument was or what it contained beyond the statement attributed to Chris M. Rasmussen. This was said to have happened about 1937. If there was such an experience, the instrument was shown to be in the possession and control of the alleged testator. It was not found after his death and the presumption is that he destroyed it with the intention of revoking it. Williams v. Miles, 68 Neb. 463, 94 N. W. 705, 110 Am. S. R. 431, 62 L. R. A. 383; In re Estate of Ladman, 128 Neb. 483, 259 N. W. 50; In re Estate of Drake, 150 Neb. 568, 35 N. W. 2d 417.

It was adjudicated March 25, 1950, by the county court of Dakota County in a proceeding in which it had jurisdiction that Chris M. Rasmussen died intestate. Appellees were present at that time in the courtroom, except Minnie Nelson and she had personal knowledge of the proceedings and the time and place of the hearing. The adjudication of the county court that he died intestate became final. This case is an attempted collateral attack on that adjudication. The adjudication of that court bars appellees from contending contrary to it. §§ 30-1701 to 30-1704, R. R. S. 1943; In re Heirship of Robinson, 119 Neb. 285, 228 N. W. 852.

It was testified by Minnie Nelson and Sena Jensen, sisters of appellant, that shortly after the death of their father in 1939 appellant told them there was a will but that there was no use of their doing anything because "it was all left to Mother as long as she lived and then it was to be divided among the children." Appellant denied that he knew anything about a will of his father or the contents of any such an instrument or that he made the alleged statements ascribed to him by his sisters. If appellant told them that their father left a will, then they knew as much about it as appellant did and the alleged conversations took place about 11 years before the hearing in the county court in which it was adjudicated that their father died without a will. The sisters each had actual notice of the time and place of the hearing and what it was for. Sena Jensen was present at the hearing. She made no objection nor did she claim her father left a will. The sisters participated in the sale of the land on the basis that there was no will. Minnie Nelson and her husband bought part of the land and both sisters received and have retained part of the proceeds of the sale which was made and concluded on the basis that there was no life estate affecting it; that the fee title was capable of sale and conveyance; and that it was sold and conveyed. Appellees or any of them made no claim of the existence of a will of their father until this cause was commenced about 14 years after his death and more than 3 years after it had been adjudicated that he died intestate. They may not now be heard to contend that their father did not die intestate. The purpose of this effort was to permit appellees to claim that their mother was duped into consenting to sell the farm land against her will by improper influence exerted upon her and by a conspiracy. This is indicated in the testimony of Sena Jensen, gladly given, that her mother said "that Dad fixed things the way they are supposed to be and that is the way they are going to be." The witness was asked if her mother said anything at that

time about "your father's will." Her answer was that her mother made only the one statement quoted above. Chris M. Rasmussen had not provided anything about the disposition of the property he owned at the time of his death. In the light of this the statement attributed to the deceased is neither intelligible nor significant. Notwithstanding the foregoing, appellees offered evidence of a conversation said to have taken place between the deceased in her home and one of the appellees to the effect that the deceased said she wanted to sell the land. Soon after she and the witness discussed the price of one of the farms. The question was the difference between $65 and $75 per acre. A short period thereafter he called his mother by telephone and told her that he would take the place at $65 per acre. At the first conversation of the son and his mother the appellant was present. He suggested a price of $75 per acre. The land was sold to the other son who had discussed the matter with his mother for $65 per acre. Apparently the mother asserted herself, made the decision, and it prevailed, contrary to the suggestion of appellant.

The record contradicts the claim that the deceased did not desire to sell the land. When the interested parties met in the office of the counsel of the deceased he asked if they were ready to sign the deeds. Rasmus Rasmussen said he was not ready to do so. The deceased inquired of him why he would not take the place. He did not answer but left the office. The deceased then declared if Rasmus does not take the place which it had been contemplated he would purchase, "there isn't anyone going to get any of it." Axel Rasmussen, one of the older sons, then remarked that if Rasmus did not take it, "we will have to put it to a partition sale." Two of the sisters left the office and followed their brother Rasmus. They overtook him and induced him to return to the office. The transaction was completed. He bought the farm and the deeds to the other two farms were

executed by him at the importunity of deceased and his two sisters. Sena Jensen, on cross-examination, said that she was urging the sale of the land in 1950 because she was told that mother had no money to live on. The explanation she gave is of doubtful validity and sincerity because of the previous statement of Walter Rasmussen that his mother was not in need of money and that she had 1,200 bushels of corn in the crib, presumably crop rent from Walter because he farmed the home place on the basis of crop rent, and also because of the anxiety and activity exhibited by Sena Jensen when her brother refused to proceed with the sale and left the office to make sure that the sale of the land would be completed. The demonstration that day by the deceased convincingly disputes the contention that the deceased was actuated by and the victim of undue influence and conspiracy. She appeared very clearly as the controlling and directing person who made the decision, stated the condition, and declared the result unless Rasmus met her terms. She had independent, expert, and experienced assistance available to her but she demonstrated that she could competently decide and speak for herself. The description offered by some of the appellees that she was a whimpering, emotional, and helpless old woman was definitely refuted by her conduct on the occasion just reviewed.

Chris M. Rasmussen died intestate and the land owned by him descended, by operation of law, to his widow, Martha Rasmussen, and his nine children. Any one or more of them could have legally compelled a partition of the land, which would have in all probability resulted in a sale of it because of the nature thereof and the fractional shares of the owners. It was not a conspiracy or undue influence for one or more of the owners to negotiate for and obtain an agreement with the other owners to sell the land which was, in effect, a voluntary partition of it. Any owner had a right to accomplish that result without legal proceedings if pos-

sible and if this could not be done then by the procedure provided by law. The contention that it was undue influence or a conspiracy for appellant and Axel Rasmussen to seek and induce a sale of the land is a fantasy unsupported by fact or law.

The deceased and her heirs, except Minnie Nelson and the heirs of Hans Rasmussen, deceased, were in the county court of Dakota County March 25, 1950, attending the hearing on the petition for determination of the heirs of Chris M. Rasmussen, deceased, and the petition for the determination of the heirs of Hans Rasmussen, deceased. Mark J. Ryan was present as counsel for Martha Rasmussen and conducted the hearings. The owners of the land who were present bound themselves that day by contract to sell the three farms owned by Chris M. Rasmussen at the time of his death. Thereafter, before May 20, 1950, they were present in the office of Mark J. Ryan and executed deeds to the purchasers of the land. The deeds were afterwards executed by the remaining owners.

There is no issue that the land or any part of it did not sell for its fair and reasonable value. The land was conveyed to the purchasers. The purchase price of the land was paid to the owners in the proportion that the ownership of each bore to the net total purchase price. The payments were received, accepted, and have since been retained by the respective owners. Martha Rasmussen received and disposed of one-third of the net proceeds of the sale of the land as has been herein detailed. She was acquainted with Mark J. Ryan, a member of the bar of Nebraska and a former judge for many years of the district court for the district of which Dakota County is a part, and she was represented by him as her attorney at all times from at least March 6, 1950, through May 23, 1950, when all matters concerned with the sale of the land were completed; the money received by Martha Rasmussen had been disposed of; and the bonds in question were purchased and delivered

to her and by her deposited in the joint safety deposit box belonging to her and appellant in the Nebraska State Bank of South Sioux City. Martha Rasmussen had the independent advice and services of her counsel in all those matters.

The daughter of Martha Rasmussen referred to above testified that about a month after the deeds were executed appellant, in the presence and hearing of his mother, said that he had mother's money put in $12,000 worth of bonds; that he had himself made co-owner of the bonds so that as soon as mother was gone they could pay out and not have to go through court again; and that the rest of her money was put in her bank account. Appellant denied that he made the statements. He testified that he had nothing to do with and expressed no opinion or desire to his mother or anyone as to how the money received by her should be disposed of or invested and that he did not know that she had purchased bonds until he saw an interest check that came through the mail which was payable to his mother and to him. Mrs. Rasmussen lived about 2 years after the alleged conversation. The witness said she spent about one-third of her time with her mother. There was no claim that the witness made any inquiry, protest, or objection to her mother or otherwise concerning what she claimed appellant said had been done. The first time any question was expressed or raised, so far as the record is concerned, in reference to any of these matters was more than 3 years after the transactions.

The subject matter of this case consists of two separate and distinct transactions. One involved the bank deposit. It happened in the summer of 1949. The other concerned the United States savings bonds. It occurred in the spring of 1950. The deposit account of $4,778.42 in the Nebraska State Bank of South Sioux City was in the names of Martha Rasmussen or Chris Rasmussen at the time of the death of the former. The deposit as between the bank and the surviving co-owner became

the sole and absolute property of the latter. The bank was not only justified but was legally compelled to permit appellant, as it did do, to withdraw the deposit by his check as his funds after the death of the deceased. The relevant part of section 8-167, R. R. S. 1943, is: "When a deposit in any bank * * * is made in the name of two * * * persons, * * * payable to either or to their survivor * * * such deposit * * * may be * * * paid to either of said persons or to the survivor * * *." The statute was intended for the protection of banks but it also establishes the property rights of the persons described therein unless the contrary appears from the terms of the deposit. If a deposit is made in a bank payable to two persons, either expressly as joint tenants with right of survivorship or without such qualifying words, upon the death of one of the co-owners of the deposit it is payable to the surviving co-owner thereof. In re Estate of Johnson, 116 Neb. 686, 218 N. W. 739; McConnell v. McCook Nat. Bank, 142 Neb. 451, 6 N. W. 2d 599; Rose v. Kahler, 151 Neb. 532, 38 N. W. 2d 391; Scriven v. Scriven, 153 Neb. 655, 45 N. W. 2d 760; DeForge v. Patrick, 162 Neb. 568, 76 N. W. 2d 733.

The form and nature of a joint deposit in the name of two persons in a bank is not, upon the death of one of the co-owners, conclusive as to the ownership of the deposit by the surviving co-owner as between him and a third person who claims that the surviving co-owner holds the legal title to the funds in trust for the third party. In re Estate of Johnson, supra; Scriven v. Scriven, supra.

If a person occupies a relationship of confidence and trust to another and by untrue statement, wrongful conduct, or concealment of the truth induces or causes the other, a person of extreme age and of some degree of debility, to make or to attempt to make a gift of a material part of his estate to the former which he otherwise would not have done, the imposition is in equity a constructive fraud and the beneficiary thereof will

be determined to hold the legal title to the subject of the gift in trust for the benefactor or his successor.

It is said in Box v. Box, 146 Neb. 826, 21 N. W. 2d 868: "If a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title." See, also, Peterson v. Massey, 155 Neb. 829, 53 N. W. 2d 912; Stieber v. Vanderlip, 136 Neb. 862, 287 N. W. 773.

Appellant was requested to consult with the bank and ascertain if the signature card given to it by the deceased at the time she opened her checking account with the bank was in the custody of it and then effective to authorize withdrawal from the deposit account as the signature card evidenced when it was executed and placed in the custody of the bank. The card then authorized funds to be paid from the account on the signature of the deceased or appellant. If that was found to be the status and effect of the signature card when the inquiry was made, she requested appellant to ascertain that information and in that event she expressed no desire or intention to disturb or change it in any respect; but if it was not the situation, then she asked him to get another or new card. He brought her the existing signature card which was then effective as it was originally completed and committed to the custody of the bank. He took it to the deceased and informed her that the official of the bank had said that if she and appellant signed the survivorship agreement exhibited on the back of the card, appellant could withdraw her money from the bank. She had not indicated that she desired to change the deposit to a joint one payable to her and appellant and she was not told that the effect of

her and appellant signing the signature card on the back of it would make it a joint account. The doctrine stated above is, under the circumstances of this case, appropriate, applicable, and controlling as to the proceeds of the bank deposit as it existed at the time of the death of the deceased and was afterwards withdrawn by appellant. It is therefore determined that appellant received and holds the legal title thereto as trustee for the legal representative of the estate of Martha Rasmussen, deceased, and that he should be required forthwith to account therefor and pay to the representative of the estate the amount appellant received from the deposit, the sum of $4,778.42.

Appellant, upon the death of his mother, became the sole owner of the United States savings bonds issued and registered on or about May 23, 1950, in the names of Martha Rasmussen or Chris Rasmussen described in the record of this case as consisting of eight $1,000 bonds and eight $500 bonds. A United States savings bond is a contract between the federal government and the purchaser. Treasury Department regulations governing such bonds are incorporated into such contract by reference and are beyond reach of state law to modify or destroy. If such bonds are issued and registered in the names of two persons as co-owners, the rights of a surviving co-owner arise solely from the contract. The surviving co-owner of the bonds takes title thereto by reason of Treasury Department regulations incorporated in the contract between the government and the purchaser. 31 U. S. C. A., § 757c, p. 622; § 315.45, 31 C. F. R. (1949 Ed.); Rohn v. Kelley, 156 Neb. 463, 56 N. W. 2d 711; United States v. Dauphin Deposit Trust Co., 50 F. Supp. 73; In re Bartlett, 71 F. Supp. 514; Annotations, 168 A. L. R. 245, 173 A. L. R. 550. The record does not impeach the ownership of the bonds by appellant or his right to or enjoyment of the proceeds of them. The proof is insufficient to establish that he had any part in the purchase of the bonds or that he in any way at-

tempted to induce or influence the deceased to purchase them or have them issued and registered in the names of Martha Rasmussen or Chris Rasmussen. Martha Rasmussen had independent advice and assistance of counsel in all matters in which she was interested in the sale of the land, the disposition of the funds she received from the proceeds of the sale, and in the purchase of the bonds. The principle decisive of this case so far as it concerns the bonds is stated in Peterson v. Massey, *supra,* in this manner: "The burden of establishing a constructive trust is always upon the person who bases his rights thereon and he must do so by evidence that is clear, satisfactory, and convincing." Appellees have not satisfied the burden thus imposed. It is determined that appellant is the owner of the bonds and all interest or other accruals to them by absolute title and he is entitled to the unconditional possession of them. The bonds are in the custody of Mark J. Ryan as the representative of the estate of Martha Rasmussen, deceased, awaiting the determination of this cause, and he should be directed and ordered to forthwith surrender and deliver the bonds to appellant without condition.

Appellants contest the compensation made counsel for appellees who were plaintiffs for their services rendered in this case. After the judgment was rendered by the district court, counsel for appellees filed an application for allowance of attorneys' fees which is, in substance, the following: They commenced and prosecuted this case for appellees in which it was adjudged that Chris Rasmussen, one of the appellants, should pay to the representative of the estate of Martha Rasmussen, deceased, $4,778.42 and legal interest from May 2, 1952, and deliver to said representative United States savings bonds of the value of $12,000 and interest accrued thereon from November 1, 1952; and that the judgment was for the benefit of all the heirs of the deceased. There were heirs of the deceased who did not

join appellees in the prosecution of the case. The attorneys contracted with appellees for a contingent fee or compensation of one-third of all amounts recovered by the action, which was a reasonable amount. They asked an order requiring the representative of said estate to pay one-third of the amount of the judgment to the attorneys for appellees on account of their services rendered in the case in protecting and preserving said funds for the benefit of all of the heirs of the deceased.

The application was verified on belief. The record fails to show that any evidence was offered in support of it. It was submitted to the court on the day it was filed. Later the district court entered an order "that the application of plaintiffs' attorneys of the allowance of attorneys' fees should be and it is allowed in the amount of twenty-five percent of the judgment entered on June 4, 1956," which is the judgment above referred to. The motion of appellants for a new trial was denied on the day the order allowing fees was entered.

In Linn v. Linn, 146 Neb. 666, 21 N. W. 2d 283, it is said: "Where the services of a litigant's attorney result in rescuing or preserving property or funds, not only for the benefit of the particular litigant but for the benefit of all others in the same class, the court may in the exercise of a sound legal discretion order a reasonable fee to be paid to such attorney from the common fund or by those benefited by it." The opinion in that case contains the following: "It must appear from the record that all in the class benefited from the action of the one making the claim." See, also, Allen v. City of Omaha, 136 Neb. 620, 286 N. W. 916; State ex rel. Ebke v. Board of Educational Lands & Funds, 159 Neb. 79, 65 N. W. 2d 392.

Obviously the class referred to in the present action was the heirs of Martha Rasmussen, deceased. Chris Rasmussen was one of her heirs and he was not and could not be benefited by this action because the object

and purpose of it was to recover from him, that is, take something from him and not to contribute anything to him.

The judgment of the trial court rendered in the case had not become final and the litigation had not yet terminated at the time of the order allowing attorneys' fees. The order of the district court allowing attorneys' fees is also inappropriate because of the conclusions expressed herein concerning the merits and disposition of the case. The order cannot be sustained. There is neither statutory authority nor uniform course of procedure to justify the allowance of compensation to the attorneys for appellees in the circumstances of this case. State ex rel. Ebke v. Board of Educational Lands & Funds, *supra*.

The judgment and the order allowing attorneys' fees to the counsel for appellees should be and they each are reversed and the cause is remanded to the district court for Dakota County with directions to render and enter in this cause a judgment as follows:

1. Requiring Chris Rasmussen, one of the appellants, to account for and pay forthwith to Mark J. Ryan as administrator of the estate of Martha Rasmussen, deceased, the sum of $4,778.42 with interest thereon at 6 percent per annum from May 2, 1952.

2. Adjudicating that Chris Rasmussen is the owner and entitled to the possession of the United States savings bonds, series G, in the principal sum of $12,000 purchased by Martha Rasmussen in her lifetime and issued and registered in the names of Martha Rasmussen or Chris Rasmussen and fully described in the record of this case, and the interest accruing thereon from May 2, 1952; and that Chris Rasmussen is entitled to collect, receive, retain, and use as his absolute property the proceeds of said bonds.

3. That Mark J. Ryan, one of the appellants, who has the custody of the bonds, is required forthwith to

surrender and deliver the bonds without condition to Chris Rasmussen.

REVERSED AND REMANDED WITH DIRECTIONS.